# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

* * *

RICHARD ALLEN WALKER,

                Petitioner,

  v.

DWIGHT NEVEN, et al.,

                Respondents.

Case No. 2:13-cv-01099-APG-VCF

**ORDER**

      Before the court for a decision on the merits is an application for a writ of habeas corpus filed by Richard Allen Walker, a Nevada prisoner. ECF No. 55.

## I. BACKGROUND

      With his petition, Walker is challenging a January 1995 judgment of conviction in the state district court for Clark County, Nevada, on charges of first degree murder with use of a deadly weapon and robbery with use of a deadly weapon. The Supreme Court of Nevada recounted the facts of Walker's case and the testimony presented at his trial as follows:

>       On April 14, 1992, at 2:47 a.m., Thomas Harmon ("Harmon"), a Las Vegas Metropolitan Police Department ("LV Metro") officer, found the body of Kevin Marble ("Marble") in an alleyway behind Boston Avenue in Las Vegas. The body was lying in a large pool of blood. Footwear impressions from two different sets of shoes appeared in the blood. A survival-type knife lay on the nearby sidewalk. Marble had been stabbed once in the neck and once in the chest.
>
>       Appellant Richard Allan Walker ("Walker") was charged with first-degree murder with use of a deadly weapon and robbery with use of a deadly weapon. A jury trial commenced on May 31, 1994.
>
>       At trial, John McDonald ("McDonald") testified that in April 1992, David Riker ("Riker") and Walker were working for him as "carnies" in Blythe, California. McDonald testified that on April 10, 1992, at approximately 8:00 p.m., Walker quit. Soon thereafter, Riker also quit.
>
>       Philip Quinn ("Quinn"), also a carnie, testified that he shared a motel room in Blythe with Riker and Walker. Quinn testified that they had discussed

leaving the carnival, and Riker had mentioned going to Las Vegas. Quinn testified that Riker owned a pair of brown or black boots with red laces (the "Colorado boots"), and Walker owned one or two pairs of tennis shoes.

Melvin Bergman ("Bergman"), of the National Oceanic and Atmospheric Administration ("NOAA"), and his crew were also working in Blythe in April 1992. On April 11, 1992, a Suburban van used by the NOAA crew (the "NOAA van") was stolen. Four days later, when Bergman recovered the NOAA van in Las Vegas, he noticed that parts of it had been spray-painted red. Bergman testified that upon recovery, a survival knife and its sheath were missing from a box in the van. At trial, Bergman identified photographs of the knife and sheath, and noted that the knife was bent in the photographs.

Thomas Thowsen ("Thowsen"), a LV Metro officer, testified that the NOAA van was recovered on South Highland in Las Vegas. Trans Sierra Communications ("TSC") was located nearby at 3347 South Highland.

Joseph Matvay ("Matvay"), a LV Metro senior crime analyst, testified that the NOAA van appeared to have been spray-painted in an attempt to obliterate latent fingerprints. Matvay identified a fingerprint on the driver's seat belt buckle as Walker's, and also found Riker's fingerprints in the van.

Stephen Glen Kirk ("Kirk") testified that in April 1992 he was employed by TSC and was Marble's coworker. Kirk testified that on April 13, 1992, at about 8:30 p.m., Marble came to his house to pick up some keys and an identification card. Marble told Kirk that he was going to the TSC office to work on some blueprints for a school, and then Marble was going home. Kirk identified a van recovered in Barstow as the van Marble drove (the "TSC van"), and identified objects found in the van, including blueprints, keys, and Marble's wallet.

Kathy Marble, Marble's wife, testified that Marble's West Boston Avenue apartment was near the TSC office.

Louis DeFalco ("DeFalco") testified that in April 1992 he ran security at the Primadonna Hotel and Whiskey Pete's at Stateline, Nevada. On April 14, 1992, between 1:20 and 1:30 a.m., he was notified about a confrontation between a drunk white male and a security guard in the parking lot. The white male was near a white van with "RC or TC Communications" printed on the side. DeFalco described the man as clean-shaven and having shoulder-length blondish-brown hair. DeFalco observed the man get into the passenger side of the van, and the van leave the parking lot in a reckless manner. A PBX operator notified the Nevada Highway Patrol and the California Highway Patrol ("CHP") about the van.

William Flowers ("Flowers"), a CHP officer, testified that at 1:33 a.m. on April 14, 1992, CHP dispatch notified him and his partner, Officer Nester ("Nester"), of a possible drunk driver involved in breaking a car window in the Whiskey Pete's parking lot. Dispatch said that the driver was a male with long hair and a beard. Flowers and Nester received a second call at 3:16 a.m., when the vehicle passed the agricultural check station. Personnel at the agricultural station had reported that the parties within the van smelled of alcohol, and that a bearded male was passed out in the back of the van. Flowers and Nester saw the

van, confirmed the license plate number, and called for assistance to stop the vehicle. Flowers testified that he observed the van weaving within its lane, and stated that drunk drivers display these types of maneuvers due to a lack of coordination. Flowers and Nester followed the van for over six miles before Flowers signalled for it to pull over. Flowers testified that the van accelerated to 90 m.p.h. before it exited at Main Street in Barstow.

Barry Hazelett ("Hazelett"), a Barstow police officer, testified that at 3:27 a.m. he was involved in chasing a TSC van down Main Street in Barstow. The van ultimately crashed into an embankment. Both Riker and Walker were injured. Riker was removed from the driver's seat. Hazelett found a knife near Riker's foot, and Marble's driver's license outside the vehicle on the driver's side. When Walker was pulled out of the passenger side, he was wearing a knife sheath on his belt. At trial, Bergman identified this sheath as the mate for the survival knife. Hazelett described Walker as half-white, half-Asian, with long black hair.

Donald Dibble, formerly a LV Metro detective, testified that he impounded Riker's and Walker's clothes. The clothes associated with Walker included a pair of white Jordache athletic shoes, and a black vinyl knife sheath.

Terry Cook ("Cook"), a criminalist for the LV Metro Crime Lab, tested items retrieved from the TSC van for Riker's, Walker's and Marble's blood types. Cook testified that blood found on a set of black boots with red laces, on a pair of blue jeans, on a black-handled knife, and on a glove was consistent with Marble's blood type, to the exclusion of Riker and Walker. Cook found a small amount of Type A blood on a pair of Jordache athletic shoes consistent with either Riker's or Marble's blood type. The amount of blood on a knife with a compass and a bent handle was not enough to test. Blood on other items corresponded with either Walker's or Riker's blood types.

Richard Good ("Good"), an expert in footwear impression comparison, testified that several impressions in Marble's blood trail corresponded to the Jordache athletic shoes in evidence, although not to the exclusion of all other athletic shoes. Two impressions corresponded to the Colorado boots.

*Walker v. State*, 944 P.2d 762, 766-67 (Nev. 1997).

Prior to the beginning of Walker's trial, David Riker was convicted and sentenced to death for Marble's murder. The State sought the death penalty against Walker as well, alleging as aggravating circumstances that the murder was committed while Walker was engaged in a robbery or attempted robbery and that the murder was committed at random or without apparent motive.

The jury verdicts supporting Walker's convictions were returned on June 21, 1994. Before the penalty phase hearing, Walker filed a motion for new trial. After a penalty phase hearing in October 1994, the jury, having found no aggravating circumstance and found his lack

3

of a significant criminal history as a mitigating circumstance, sentenced Walker to life without possibility of parole with respect to the first degree murder.

The judgment of conviction entered on January 10, 1995 sentenced Walker to two consecutive life sentences without possibility of parole for the first degree murder with use of a deadly weapon to be followed by two consecutive sentences of 15 years for the robbery with use of a deadly weapon. The trial court held hearings on Walker's motion for new trial in February 1995 and entered an order denying the motion in August 1995.

The Supreme Court of Nevada affirmed the judgment conviction in August 1997.

On September 10, 1999, Walker filed a petition for post-conviction relief in the state district court. That proceeding did not conclude in until June 2013, with the Supreme Court of Nevada affirming the lower court's denial of collateral relief.[1] On June 20, 2013, Walker filed a petition for writ of habeas corpus under 28 U.S.C. § 2254 that initiated this action. This court appointed counsel for Walker. On May 27, 2014, he filed an amended petition.

In a September 29, 2014 order, this court dismissed Grounds N and O from the amended petition. Respondents then filed a motion to dismiss. On September 30, 2015, the court entered an order dismissing Ground D, G, Q(1), S, and A (to the extent it raised a stand-alone claim of actual innocence). That order also found Grounds B and J unexhausted. On December 28, 2015, Walker filed a notice of election to proceed on the exhausted claims but reserving the right to request a certificate of appealability regarding the exhaustion of Grounds B and J. This order addresses Walker's remaining claims on the merits.

////

////

---

[1]  At least one of the reasons for the significant delay is that Walker was extradited to California in May of 2000 to stand trial, along with Riker, for a murder and theft/robbery that occurred in Blythe, California, a few days prior to the Marble murder. That trial took place in April 2005 and resulted in Riker being convicted of first degree murder and robbery, while Walker was convicted of grand theft, but acquitted of the murder charge. *See Riker v. Benedetti*, 2011 WL 978260 (C.D. Cal. Feb. 2, 2011); *People v. Riker*, 2007 WL 4357741 (Cal. Ct. App. Dec. 14, 2007).

II. STANDARDS OF REVIEW

This action is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA). 28 U.S.C. § 2254(d) sets forth the standard of review under AEDPA:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).  An "unreasonable application" occurs when "a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id*. at 409.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id*. at 411.

The Supreme Court has explained that "[a] federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).  The "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997); *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002) (per curiam)).  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v.*

*Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

The Supreme Court has emphasized "that even a strong case for relief does not mean the state

court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade*, 538 U.S. 63, 75

(2003)); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the AEDPA

standard as "a difficult to meet and highly deferential standard for evaluating state-court rulings,

which demands that state-court decisions be given the benefit of the doubt") (internal quotation

marks and citations omitted).

"[A] federal court may not second-guess a state court's fact-finding process unless, after

review of the state-court record, it determines that the state court was not merely wrong, but

actually unreasonable." *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004); *see also Miller-El*,

537 U.S. at 340 ("[A] decision adjudicated on the merits in a state court and based on a factual

determination will not be overturned on factual grounds unless objectively unreasonable in light

of the evidence presented in the state-court proceeding, § 2254(d)(2).").

Because de novo review is more favorable to the petitioner, federal courts can deny writs

of habeas corpus under § 2254 by engaging in de novo review rather than applying the

deferential AEDPA standard. *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010).

III. DISCUSSION

*Ground A*

In Ground A, Walker alleges that the State failed to produce sufficient evidence at his

trial to convict him.[2]  He contends the evidence establishes that Riker alone killed Marble – i.e.,

there was a lack of evidence demonstrating that Walker participated in the murder and there was

evidence that Walker was passed out from alcohol consumption at the relevant time.  Walker

also argues that, because the jury rejected the robbery aggravator in the penalty phase, its guilt

phase verdict must have rested on a specific intent theory rather than a felony murder theory and,

---

[2]  Walker also advances an actual innocence claim in Ground A.  That portion of Ground A was dismissed by this court's order of September 30, 2015 (ECF No. 95).

that being the case, the evidence presented at his trial was insufficient to convict him of willful murder.

> Walker argues that the State failed to present sufficient evidence of guilt to support his convictions for murder with use of a deadly weapon and robbery with use of a deadly weapon; therefore, according to Walker, the district court erred in denying his motion for judgment of acquittal notwithstanding the jury verdict.

> When the sufficiency of evidence is challenged on appeal in a criminal case, this court inquires "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Hutchins v. State*, 110 Nev. 103, 107-08, 867 P.2d 1136, 1139 (1994). "Circumstantial evidence alone may sustain a conviction." *McNair v. State*, 108 Nev. 53, 56, 825 P.2d 571, 576 (1992).

> Evidence that Walker participated in the murder and robbery of Marble includes bloody footprints matching Walker's athletic shoes and a knife at the murder scene that matched a sheath Walker was wearing when stopped in Barstow. Additionally, Walker's fingerprint was found in the NOAA van a few blocks from the murder scene. Marble's personal property and items with blood matching Marble's blood type on them were found within the TSC van. We conclude that sufficient evidence in the record supports Walker's convictions.

*Walker*, 944 P.2d at 767-68.

The test articulated by the Supreme Court of Nevada is the "rational factfinder" standard established by U.S. Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Thus, the state court applied the correct federal law standard to determine whether, as a matter of due process, sufficient evidence supported Walker's conviction. *See Mikes v. Borg*, 947 F.2d 353, 356 (9th Cir. 1991). And because this court must review the Supreme Court of Nevada's sufficiency of evidence determination under AEDPA, "there is a double dose of deference that can rarely be surmounted." *Boyer v. Belleque*, 659 F.3d 957, 964 (9th Cir. 2011). That means that even if this court "think[s] the state court made a mistake," the petitioner is not entitled to habeas relief unless the state court's application of the *Jackson* standard was "'objectively unreasonable.'" *Id.*

Additional evidence beyond that cited by the Supreme Court of Nevada indicated that Walker participated in the murder. Blood found in the treads of Walker's shoes matched

Marble's or Riker's blood type, but not his. ECF No. 28, p. 29-31.[3]  And, the bloody footprints at the scene that matched shoes associated with Walker were in addition to bloody footprints matching boots associated with Riker, which dispels Walker's claim that Riker acted alone. ECF No. 28, p. 179-204.  Also, a knife was found in the TSC van with Marble's blood type (to the exclusion of Walker and Riker's blood types) and another was found at the murder scene (the one matching a sheath Walker was wearing), so two knives were directly connected to the murder. ECF No. 26, p. 115-116; ECF No. 28, p. 32.[4]

This court also rejects Walker's argument that the guilt phase verdict must have been premised on a specific intent theory rather than a felony murder theory.  The jury found Walker guilty of robbery in the guilt phase.  Its rejection of the robbery aggravating circumstance did not, perforce, mean that it could not have relied upon felony murder as the basis for its first degree murder verdict. *See McConnell v. State*, 102 P.3d 606, 623 (Nev. 2004) (noting that the felony aggravator adds an element not required for felony murder – i.e., that the defendant killed or attempted to kill the victim or knew or had reason to know that life would be taken or lethal force used).  And, as discussed below in relation to Ground K, the testimony of DeFalco, the casino security officer, strongly suggests that Walker was driving when Riker and Walker left the casino headed for California, shortly after the murder.  This undermines Walker's claim that he was too intoxicated to participate in the murder.

In summary, this court concludes that the Supreme Court of Nevada's application of the *Jackson* standard was not objectively unreasonable, nor was its decision based on an

---

[3] Citations to page numbers for documents filed on the court's electronic docket are based on CM/ECF pagination.

[4] The medical examiner who conducted an autopsy on Marble's body testified that either knife could have caused Marble's wounds. ECF No. 28, p. 99-104.  He also testified that the wounds Marble suffered were not the type that would result in "surge of hemorrhage." *Id*., p. 100-07. This would explain why Walker's clothes did not have a significant amount of blood on them – a fact he relies upon to support his claim that he did not participate in the murder.

unreasonable determination of the facts. Accordingly, this court defers to the state court decision.

Ground A is denied.

*Ground C*

In Ground C, Walker alleges that the trial court violated his constitutional rights when it precluded him from introducing the testimony of a medical doctor regarding his blood alcohol level during the time of the Marble killing and robbery. On May 27, 1994, a week before the start of Walker's trial, Arthur B. Pitterman, M.D., interviewed Walker about his history of drug and alcohol use and his use on the day of the murder. ECF No. 51, p. 4-15. Based on that interview and on Walker's blood alcohol content (as measured at the hospital after his arrest), Dr. Pitterman provided a report to Walker's counsel in which he opined that Walker was "profoundly intoxicated or unconscious" at 11:30 p.m. on April 13, 1992 (i.e., at the approximate time of the murder). *Id.*

The State objected to allowing Dr. Pitterman to testify about the report, arguing that, unless Walker also testified, the State would have "no way of getting at or attacking the reliability of what the Defendant told . . . Dr. Pitterman." ECF No. 28, p. 66. The trial court granted the State's motion in limine based on a determination that Walker's statements to Dr. Pitterman were hearsay that did not fall within the medical diagnosis exception (Nev. Rev. Stat. § 51.115) because they were not made for the purposes of treatment. ECF No. 29, p. 24-25. The court also noted that the State had not been notified of the report until after the trial began and, as such, did not have an opportunity to rebut the evidence. *Id.*, p. 26.

On direct appeal, the Supreme Court of Nevada rejected the claim contained in Ground C as follows:

> Walker argues that the trial court abused its discretion by refusing to allow Dr. Pitterman, an internal medicine doctor, to testify about Walker's history of drug abuse and alcoholism and level of intoxication at the time of the crime. The trial court had ruled that this evidence did not fall within the medical diagnosis exception to the hearsay rule. Walker contends that Dr. Pitterman's determination of Walker's blood alcohol level during the evening of April 13, 1992, was reliable

because it was based upon hospital records, and therefore was admissible pursuant to the general exception to the rule against hearsay. *See* NRS 51.075; *Emmons v. State*, 107 Nev. 53, 807 P.2d 718 (1991) (testimony of a medical examiner regarding another radiologist's opinion was properly admitted where the medical examiner was a disinterested witness with no apparent motive to lie). Walker asserts that the evidence was critical because it helped prove that he lacked the *mens rea* to commit first-degree murder.

On May 27, 1994, Dr. Pitterman interviewed Walker concerning his medical history. He then sent his findings to defense counsel. Dr. Pitterman's statements appear to have been generated for the purposes of litigation, not for medical diagnosis or treatment. Therefore, his testimony was not admissible under the medical diagnosis exception to the hearsay rule, NRS 51.115.

Dr. Pitterman was not a disinterested witness, but made his report at the request of defense counsel. Moreover, Dr. Pitterman's conclusions were partly based upon information obtained from Walker. For example, Walker told Dr. Pitterman that he had been smoking marijuana on April 13, 1992, and the doctor stated that the use of marijuana would increase the effect of alcohol. We conclude that the trial court did not abuse its discretion in refusing to admit Dr. Pitterman's testimony.

*Walker*, 944 P.2d at 774.

Walker argues that Dr. Pitterman's proposed testimony was admissible as a general exception to the hearsay rule[5] and would have demonstrated that Walker was too intoxicated to form the *mens rea* necessary to find him guilty of a specific intent crime. He contends that the Supreme Court of Nevada's decision affirming the trial court's decision to exclude Dr. Pitterman's testimony runs contrary to U.S. Supreme Court decisions recognizing a criminal defendant's right to present evidence relevant to his or her defense. This court disagrees. For the reasons that follow, the Supreme Court of Nevada's decision is worthy of deference under § 2254(d).

The U.S. Supreme Court has recognized that the Constitution guarantees criminal defendants a "meaningful opportunity to present a complete defense," but that "state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." *Nevada v. Jackson*, 569 U.S. 505, 509 (2013) (citing *Crane v. Kentucky*, 476

---

[5] The general exception, Nev. Rev. Stat. § 51.315, provides that "[a] statement is not excluded by the hearsay rule if . . . [i]ts nature and the special circumstances under which it was made offer strong assurances of accuracy. . . ."

U.S. 683, 690 (1986) and *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006)).  Accordingly, "[o]nly rarely [has the Court] held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence." *Id*. (citing as examples *Holmes*, 547 U.S. at 331 (rule did not rationally serve any discernible purpose); *Rock v. Arkansas*, 483 U.S. 44, 61 (1987) (rule arbitrary); *Chambers v. Mississippi*, 410 U.S. 284, 302–303 (1973) (State did not even attempt to explain the reason for its rule); *Washington v. Texas*, 388 U.S. 14, 22 (1967) (rule could not be rationally defended)).  Evidentiary rules or decisions do not violate a defendant's constitutional rights unless they "infring[e] upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve." *Holmes*, 547 U.S. at 324 (alteration in original) (internal quotation marks and citation omitted).

The Court in *Crane* concluded that the exclusion of testimony about the circumstances of the defendant's confession violated the defendant's constitutional right to present a defense because it was "competent, reliable evidence" that was "central to the defendant's claim of innocence" and the State had failed to advance "any rational justification for the wholesale exclusion of this body of potentially exculpatory evidence." *Crane*, 476 U.S. at 690-91.  Likewise, the Court in *Holmes* invalidated an evidentiary rule that excluded defense evidence about a third party's alleged guilt where there was strong evidence of the defendant's guilt, even if the excluded evidence "would have great probative value and even if it would not pose an undue risk of harassment, prejudice, or confusion of the issues." *Holmes*, 547 U.S. at 329-31.

Here, the Supreme Court of Nevada reasonably concluded that Dr. Pitterman's proposed testimony did not fall within either the medical diagnosis exception or the general exception to the rule against hearsay.  At most, Dr. Pitterman should have been permitted to testify as to his opinion based on the hospital's test results alone, i.e., without relying on what Walker had told him regarding his ingestion of alcohol and marijuana.[6]  However, Dr. Pitterman's calculation as

---

[6] Walker concedes that his own statements to Dr. Pitterman were not admissible. ECF No. 55, p. 58.

11

to Walker's blood alcohol content is premised on the assumption that Walker consumed no alcohol between the time of the murder and the time of his arrest, a period of approximately four hours. ECF No. 51, p. 13-15. Without corroborating evidence regarding Walker's alcohol consumption (or lack thereof) during that time period, Dr. Pitterman's opinion had little, if any, probative value.[7]

Thus, unlike in *Crane* and *Holmes*, the excluded evidence here was only marginally relevant and there was a rational justification for not allowing its presentation at trial. Accordingly, it cannot be said that the trial court's evidentiary ruling "infringed upon a weighty interest of the accused" or was "arbitrary" or disproportionate to the purpose it was designed to serve. This, in turn, means that Walker is not entitled to habeas relief because the Supreme Court of Nevada's decision affirming the trial court's ruling did not involve an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts.

Finally, even if the trial court's evidentiary ruling violated Walker's constitutional right to present a defense, such error is subject to harmless error analysis (*Crane*, 476 U.S. at 691), meaning that Walker would be entitled to habeas relief only if the error has a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). Given the marginal probative value of his opinion, this court is not convinced the trial court's exclusion of Dr. Pitterman's testimony had such an impact in this case.

Ground C is denied.

*Ground E*

In Ground E, Walker claims that his constitutional rights were violated when the trial court denied his motion to disqualify the judge presiding over his trial. Several weeks prior to trial, Walker filed a motion to disqualify Judge Guy due to his participation on the three-judge panel that had sentenced Riker to death, which had exposed him to evidence regarding Walker

---

[7] The trial judge noted this problem in deciding to exclude Dr. Pitterman's testimony. ECF No. 29, p. 25.

and his alleged participation in the Marble murder and the Blythe murder in California. ECF No. 66-9.

At the hearing on the motion, with a different judge presiding, Walker argued that Judge Guy was biased because the panel had already made determinations regarding issues related to his trial, such as finding that depravity and the robbery were aggravating factors. ECF No. 67-3. The judge hearing the motion denied the motion. *Id.*

Walker further alleges Judge Guy's bias was manifested in his rulings on the admissibility of documentary evidence regarding Riker and his exclusive participation in the Marble murder and robbery. On direct appeal, the Supreme Court of Nevada rejected the claim contained in Ground E as follows:

> Walker argues that the district court improperly denied his motion to disqualify Judge Guy, thereby denying his right to due process and a fair trial. Judge Guy was on the panel which sentenced Riker.
>
> "The burden is on the party asserting the challenge to establish sufficient factual grounds warranting disqualification." *In re Petition to Recall Dunleavy*, 104 Nev. 784, 788, 769 P.2d 1271, 1274 (1988). Generally, "what a judge learns in his official capacity does not result in disqualification." *Kirksey v. State*, 112 Nev. 980, 1007, 923 P.2d 1102, 1119 (1996). However,
>
> > [A]n opinion formed by a judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, constitutes a basis for a bias or partiality motion where the opinion displays "a deep-seated favoritism or antagonism that would make fair judgment impossible."
>
> *Id.*, quoting *Liteky v. United States*, 510 U.S. 540, 555, 114 S.Ct. 1147, 1157, 127 L.Ed.2d 474 (1994).
>
> In the instant case, Judge Guy noted that Walker sought to admit statements which were inconsistent with evidence admitted at Riker's penalty hearing. This demonstrated a legitimate concern for the reliability of evidence brought before the jury. *See generally Leonard v. State*, 108 Nev. 79, 81, 824 P.2d 287, 289 (1992). We conclude that Walker failed to prove bias warranting Judge Guy's disqualification.

*Walker*, 944 P.2d at 769.

"[J]udicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky*, 510 U.S. at 555. Instead, a party seeking recusal on grounds of impartiality

generally must point to some extrajudicial source for the bias. *Id*. at 551. The Ninth Circuit has held that bias does not necessarily arise from the fact that a trial judge has been exposed to evidence presented at a co-defendant's trial. *See Paradis v. Arave*, 20 F.3d 950, 958 (9th Cir. 1994) (finding no bias where the trial judge presided over the trial of defendant's confederate and sentenced the confederate to death before presiding over defendant's trial).

Walker contends the Supreme Court of Nevada's decision on this issue is not entitled to deference because it misses the point of the claim – that being, that Judge Guy based rulings in Walker's case on evidence adduced in the Riker proceeding that was inadmissible in the Walker proceeding. That evidence, according to Walker, consisted of statements Riker made to mental health professionals that Judge Guy relied upon to find aggravating circumstances in Riker's case. Walker does not, however, point to any Supreme Court precedent establishing that Judge Guy's rulings in this regard violated his constitutional rights. *See Carey v. Musladin*, 549 U.S. 70, 77 (2006) ("Given the lack of holdings from this Court regarding the [issue presented] here, it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'").

Regardless of whether the Supreme Court of Nevada failed to fully grasp the theory of his claim, Walker still needs to show that, due to information learned in the Riker proceeding, Judge Guy developed an opinion "that would display a deep-seated antagonism or make fair judgment impossible." *Liteky*, 510 U.S. at 555. He has not done so.

Ground E is denied.

*Ground F*

In Ground F, Walker alleges that the trial court violated his constitutional rights when it precluded him from introducing evidence that would rebut the prosecution's theory of criminal liability – i.e., evidence that Riker killed his roommate, William Rutkowski, which Walker claims was relevant as to whether Riker had the ability to act alone in killing Marble. In support of his pre-trial motion asking the trial court to permit introduction of the evidence, Walker outlined alleged facts that, according to him, showed Rutkowski (who died from a gunshot to the

head on December 10, 1990) did not commit suicide, as ruled, but instead, had been murdered by Riker. ECF No. 68-7. In denying the motion, the trial court noted that Riker had never been charged in relation to the incident, it was speculative as to whether Riker committed the shooting, and the event was too remote in time. ECF No. 69-12, p. 30. In addressing the issue on direct appeal, the Supreme Court of Nevada decided as follows:

> Walker argues that the trial court violated his right to a fair trial by denying his pretrial motion in limine to introduce evidence that Riker killed William Rutkowski, Riker's roommate, in 1990. Walker argues that by denying his motion, the district court prevented him from proving that Riker had the ability to act alone in the robbery and killing of Marble.
>
> Rutkowski's and Marble's homicides were dissimilar: Rutkowski was shot, and Marble was stabbed. Thus, assuming arguendo that Walker could prove the prior bad act by clear and convincing evidence,[1] it does not show that Riker acted alone in murdering Marble. Accordingly, evidence of Rutkowski's homicide was properly deemed inadmissible. NRS 48.045(2).
>
> _____
>
> [1] The district court noted that no one had been charged with Rutkowski's homicide. *See Petrocelli* [*v. State*, 101 Nev. 46, 51, 692 P.2d 503, 508 (1985)] (prior bad act must be proved by clear and convincing evidence).

*Walker*, 944 P.2d at 769-70.

As discussed above, in relation to Ground C, the Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense," but trial courts also have "broad latitude" to exclude evidence under a state's rules of evidence. Walker relies on the balancing test outlined in *Miller v. Stagner,* 757 F.2d 988, 994 (9th Cir. 1985) to argue that his constitutional rights were violated by the trial court's exclusion of evidence Riker killed Rutkowski. However, the Court in *Jackson* specifically rejected the notion that the Constitution "requires a case-by-case balancing of interests" before an evidentiary rule precluding the admission of extrinsic evidence to impeach a witness could be enforced. *Jackson*, 569 U.S. 505, 510-11; *see also Moses v. Payne*, 555 F.3d 742, 760 (9th Cir. 2009) (clarifying that the *Miller* balancing test was not required under AEDPA because it was merely a creation of Ninth Circuit law, and was not established or compelled by controlling Supreme Court precedent).

Instead, evidentiary rules will not violate a defendant's constitutional rights unless they "infring[e] upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve." *Holmes*, 547 U.S. at 324 (alteration in original) (internal quotation marks omitted). In this context, a rule is "arbitrary" if it excludes important defense evidence but does not serve any legitimate interests. *Id.* at 325. Trial judges are permitted to exclude evidence where its probative value is outweighed by factors such as irrelevance, confusion of the issues, or the potential to mislead the jury. *Id.* at 326.

Here, proposed evidence suggesting Riker may have shot his roommate a year and half earlier had little probative value with respect to whether he alone committed the Marble killing. Admission of the evidence would have given rise to a trial within a trial on a collateral issue that was only marginally relevant to issues properly before the jury. It had the potential to confuse or mislead the jury. Accordingly, the trial court did not arbitrarily exclude the requested evidence, and Walker was not deprived of his opportunity to present a complete defense.

Ground F is denied.

*Ground H*

In Ground H, Walker claims that his constitutional rights were violated because the trial court failed to remove four jurors whose views regarding the imposition of a sentence of life without the possibility of parole made them unqualified to serve as jurors. In support of the claim, Walker alleges that he unsuccessfully challenged prospective jurors numbered 154, 157, 162 and 164 for cause based on their *voir dire* responses indicating that they could not impose a punishment of life with the possibility of parole for first degree murder. He further notes that he used his first four peremptory challenge to each of these jurors and that he ultimately exercised all eight of his peremptory challenges. In addressing the issue on direct appeal, the Supreme Court of Nevada decided as follows:

> Walker argues that the trial court improperly denied his challenges for cause against four prospective jurors. Walker contends that the district court improperly denied his challenges based upon the jurors' indications that they could consider a sentence of life with the possibility of parole for a person

convicted of first-degree murder in a dissimilar case. Walker relies upon *People v. Livaditis*, 2 Cal.4th 759, 9 Cal.Rptr.2d 72, 831 P.2d 297 (1992), wherein a prospective juror indicated a willingness to consider the death penalty under facts not applicable to the case, and the California Supreme Court held that the district court properly found that her ability to perform her duty was substantially impaired.

A trial court has broad discretion in its rulings on challenges for cause. *Wainwright v. Witt*, 469 U.S. 412, 428-29, 105 S.Ct. 844, 854-55, 83 L.Ed.2d 841 (1985). In *Witt*, the United States Supreme Court noted that the trial judge's "predominant function in determining juror bias involves credibility findings whose basis cannot be easily discerned from an appellate record. These are 'factual issues'. . . ." *Id*. at 429, 105 S.Ct. at 854. The California Supreme Court has noted, "[o]n appeal, if the prospective juror's responses are equivocal, i.e., capable of multiple inferences, or conflicting, the trial court's determination of that juror's state of mind is binding." *Livaditis*, 9 Cal.Rptr.2d at 78, 831 P.2d at 303.

This case involves the issue of whether prospective jurors were willing to impose a sentence of life with the possibility of parole, not whether or not a juror is willing to impose a sentence of death. However, our analysis remains guided by capital cases. "[T]he proper standard for determining when a prospective juror may be excluded for cause because of his or her view on capital punishment . . . is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Witt*, 469 U.S. at 424, 105 S.Ct. at 852 (quoting *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980)). In *Morgan v. Illinois*, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992), the United States Supreme Court held that a challenge for cause should be granted in a "reverse-*Witherspoon*"[2] situation, where a juror would always impose a sentence of death for one convicted of first-degree murder. The Court stated, "Any juror who would impose death regardless of the facts and circumstances of conviction cannot follow the dictates of law." *Id*. at 735, 112 S.Ct. at 2233.

Walker challenged prospective jurors 154, 157, 162 and 164 for cause. The trial court denied these challenges, hence Walker utilized four of eight peremptory strikes to exclude these jurors. Walker indicated that he was unable to use peremptory strikes against four other prospective jurors who he believed should not have been on the jury panel, and who were ultimately members of the selected panel. This is sufficient to establish prejudice. *Bryant v. State*, 72 Nev. 330, 335, 305 P.2d 360, 362 (1956).

Prospective jurors 154, 157, 162 and 164 had initially indicated that they could not vote to impose a sentence of life with the possibility of parole after convicting a person of first-degree murder. The prospective jurors were then given the following factual scenario: a man saw his child being raped by two men, and later found and killed the men. Each of the prospective jurors then indicated that they could consider life with the possibility of parole under these circumstances.

Reviewing the cold record, we conclude that substantial evidence supports a determination that the views of jurors 154, 157, 162, and 164 would not have prevented or substantially impaired the performance of their duties in accordance

with their instructions and oath.  Given the trial court's broad discretion, we conclude that its denial of Walker's challenges for cause of these jurors was proper.

_____

[2] Walker's opening brief contains an extensive discussion of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).  In *Witherspoon*, the United States Supreme Court held that excluding prospective jurors because they voiced general objections to the death penalty did not produce an impartial jury, but instead a jury "uncommonly willing to condemn a man to die." *Id*. at 521, 88 S.Ct. at 1776.  Subsequently, the Supreme Court clarified that the holding in *Witherspoon* concerns circumstances under which prospective jurors cannot be excluded, but does not delineate when prospective jurors can be excluded. *Wainwright v. Witt*, 469 U.S. 412, 422, 105 S.Ct. 844, 851, 83 L.Ed.2d 841 (1984); *Adams v. Texas*, 448 U.S. 38, 48, 100 S.Ct. 2521, 2528, 65 L.Ed.2d 581 (1979) (*Witherspoon* is not a ground for challenging a prospective juror).  Accordingly, in the instant case, *Witherspoon* is not on point.

*Walker*, 944 P.2d at 770-71.

The Supreme Court of Nevada correctly identified the standard in *Witt* as the proper federal law standard to use in assessing whether a prospective juror is to be excused based on his or her views on capital punishment.  There is a significant question here, however, as to whether the Supreme Court of Nevada was reasonable in finding that views of the prospective jurors in question would not "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."[8]  Even considered de novo, however, Ground H does not entitle Walker to habeas relief.

The U.S. Supreme Court has held that, while the Constitution guarantees a defendant the right to an impartial jury, the fact that a defendant is required to use a peremptory challenge to cure a trial court's error in denying a challenge for cause does not constitute a constitutional violation.  The Court stated:

We have long recognized that peremptory challenges are not of constitutional dimension.  They are a means to achieve the end of an impartial jury.  So long as the jury that sits is impartial, the fact that the defendant had to

_____

[8]  The Supreme Court of Nevada's finding with respect to prospective juror 157 is particularly suspect.  Even when presented with the child rape hypothetical, juror 157 stated that she would have a "hard time" imposing a sentence that would allow for parole and that she could envision no other circumstance under which she would be willing to do so. ECF No. 15, p. 115-16.

use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated.

*Ross v. Oklahoma*, 487 U.S. 81, 88 (1988) (citations omitted). The Court in *Ross* also rejected that petitioner's argument that he was deprived of his Fourteenth Amendment right to due process because the trial court's erroneous challenge-for-cause ruling deprived him of the full complement peremptory challenges allowed under state law. *Id*. at 89. "[B]ecause no member of the jury as finally composed was removable for cause, [the Court] found no violation of Ross's Sixth Amendment right to an impartial jury or his Fourteenth Amendment right to due process." *Rivera v. Illinois*, 556 U.S. 148, 158, (2009) (citing *Ross*, 487 U.S. at 86-91); *see also United States v. Martinez-Salazar*, 528 U.S. 304, 307 (2000) (holding that that "if the defendant elects to cure [trial court] error by exercising a peremptory challenge, and is subsequently convicted by a jury on which no biased juror sat, he has not been deprived of any . . . constitutional right").

Here, no prospective juror Walker challenged for cause was seated on his jury. At trial, Walker complained that expending four peremptory challenges on prospective jurors 154, 157, 162, and 164 deprived him of peremptory challenges that he would have used on four seated jurors – i.e., 146, 174, 181, and 185. Walker did not, however, lodge a challenge for cause against any of those four seated jurors, nor did any of the four, based on this court's review of the *voir dire*, express any views that would impact the performance of his or her duties as a juror in accordance with the court's instructions and the juror's oath. ECF No. 13, p. 124-51; ECF No. 17, p. 150-74; ECF No. 18, p. 44-64; ECF No. 20, p. 15-37. Because he has not shown that a biased or unqualified juror served on his jury, Walker has not shown that his *voir dire* did not meet constitutional requirements. *See Skilling v. United States*, 561 U.S. 358, 395 n.31 (2010) (citing *Martinez-Salazar*, 528 U.S. at 307).

Relying on a footnote in *Ross*, Walker argues that he is entitled to relief because the trial judge deliberately misapplied the law in denying his challenges for cause. In the footnote, the Court clarified that Ross had made no claim that "the trial court repeatedly and deliberately misapplied the law in order to force petitioner to use his peremptory challenges to correct these

19

errors." *Ross*, 487 U.S. at 91 n.5. Without providing further guidance, the Court in *Martinez-Salazar* and *Rivera* suggested that such conduct by a trial court could constitute a due process violation. *Martinez-Salazar*, 528 U.S. at 316; *Rivera*, 556 U.S. at 160. In any case, the record in this case demonstrates, at most, good-faith errors in denying Walker's challenges for cause. Thus, Walker's argument premised on the *Ross* footnote is unavailing.

Having concluded that no constitutional violation resulted from the trial court's denial of Walker's challenges for cause, Ground H is denied.

*Ground I*

In Ground I, Walker alleges that his constitutional rights were violated by the State's use of peremptory challenges to strike prospective jurors on gender grounds. Walker points to the fact that the State used five of its eight challenges to remove a woman from the venire. In relation to this claim, he notes that at the time of the trial he had very long hair and a beard and that almost all prospective jurors (25 of 28) were asked on *voir dire* whether those features impacted their thinking about the case. In addressing the issue on direct appeal, the Supreme Court of Nevada decided as follows:

> Walker argues that the State exercised peremptory challenges against women with an intent to discriminate on the basis of gender.
>
> "[P]otential jurors, as well as litigants, have an equal protection right to jury selection procedures that are free from state-sponsored group stereotypes rooted in, and reflective of, historical prejudice." *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 128, 114 S.Ct. 1419, 1421, 128 L.Ed.2d 89 (1994). "Gender, like race, is an unconstitutional proxy for juror competence and impartiality." *Id*.
>
> In *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the United States Supreme Court outlined a process for determining whether a prosecutor has used peremptory challenges in a discriminatory manner. First, the defendant must make a prima facie showing of intentional discrimination. *Id*. at 96, 106 S.Ct. at 1722. "In deciding whether the defendant has made the requisite showing, the trial court should consider all relevant circumstances." *Id*. at 96-97, 106 S.Ct. at 1723; *accord Libby v. State*, 113 Nev. 251, 255, 934 P.2d 220, 222 (1997). Second, the State must offer a gender-neutral explanation for striking the jurors. *See Hernandez v. New York*, 500 U.S. 352, 359, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1990). "At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation." *Id*. at 360, 111 S.Ct. at 1866. Third, the trial court must decide whether the defendant has carried his burden of proving purposeful discrimination. *Purkett v. Elem*, 514 U.S. 765, 767, 115 S.Ct. 1769, 1770, 131

L.Ed.2d 834 (1995).  At this stage, the trial court may determine that the State's justifications are mere pretexts for purposeful discrimination. *Id*.

"The trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal." *Hernandez*, 500 U.S. at 364, 111 S.Ct. at 1868.

Here, the State used five of eight peremptory challenges to strike women from the jury. *Cf. Libby*, 113 Nev. at 255, 934 P.2d at 223 (use of seven of nine peremptory challenges against female jurors established a prima facie case of discrimination).  The record does not reveal a significant difference between prosecutorial questioning of women and of men.  For example, the State questioned both male and female prospective jurors regarding their feelings about Walker's appearance.  The record also shows that the State had non-pretextual, nondiscriminatory reasons to exercise peremptory challenges against each of the prospective jurors in question.  We conclude that the trial court did not err in determining that the State exercised its peremptory challenges in a constitutionally permissible manner.  Accordingly, we decline to address Walker's other contentions elaborating upon this issue.

*Walker*, 944 P.2d at 771-72.

The Supreme Court of Nevada correctly identified *Batson* as the federal law test to determine whether the State used its peremptory challenges to engage in purposeful discrimination, in violation of the Equal Protection Clause. *See Rice v. Collins*, 546 U.S. 333, 338 (2006).  The court was also correct in recognizing that the Supreme Court of the United States had, prior to Walker's trial, extended *Batson* to peremptory challenges based on gender. *See J.E.B.*, 511 U.S. at 130-31.[9]

Based on its review of the record, this court concludes that the Supreme Court of Nevada's application of *J.E.B./Batson* was not objectively unreasonable and that its decision was not based on an unreasonable determination of the facts.  The State used its first two peremptory challenges to remove men. ECF No. 16, pp. 87, 123.  When the State used its third challenge to remove a woman (Guinn), the defense objected on gender grounds, noting that Guinn had said she thought Walker was "nicely coiffured." ECF No. 17, p. 40-41.  While it found no prima facie showing of intentional discrimination, the trial court permitted the prosecutor to make a record. *Id*.  Among other things, the prosecutor noted that Guinn had mentioned her poor memory

---

[9] *J.E.B.* was decided April 19, 1994, approximately six weeks prior to the beginning of Walker's trial.

multiple times, which caused him concern given the number of witnesses that could be called at trial. *Id.*, p. 42. The prosecutor also questioned her ability "to follow through" based on the fact that she had quit her job as a 911 operator after being employed "for about a month or two."

When the State used its fourth challenge to remove an African-American woman (Cason), the defense objected on racial, not gender, grounds. Id., p. 103-104. Once again the trial court found no evidence of intentional discrimination, but nonetheless allowed the prosecutor to make a record. *Id.* The prosecutor noted that Cason had worked for 23 years as a counselor in the Department of Corrections, "was licensed in Human Services," and admitted to being a "bleeding heart." He further explained that she had "refused to acknowledge" the felony murder rule as a theory of criminal liability and that she indicated that she believes in psychology and "works with it on a regular basis," which made him think she might give such evidence more weight than it deserves. *Id.*, p 105-06.

When the State finished making a record with respect to Cason, the trial court admonished counsel at length for objecting to peremptory challenges in the absence of "a pattern of rejection" on the basis of "race, color, or creed or sex." *Id.*, p. 106-08. Walker claims the trial court's admonishment "preclude[d] [the] defense from making or even announcing any subsequent gender-based challenges." ECF No. 109, p. 34. This court is not convinced the trial court's comments had that effect. For one, Walker subsequently objected on gender grounds when the State used its fifth peremptory challenge to remove a woman (Laws). ECF No. 18, p. 10-11. And, as discussed below, the defense's failure to object to the State's other two peremptory challenges against women was almost certainly due to obvious gender-neutral reasons supporting those challenges, not the trial court's supposed proscription against further objections.

In making an objection to the removal of Laws, the defense noted only that "[t]hree out of their five peremptories have been to women." *Id.* Finding no discriminatory intent, the trial

court overruled the objection and called in the next prospective juror. *Id.* The State did not attempt to make a record of its reasons for challenging Laws. *Id.*

The defense did not object when the State used its sixth peremptory challenge to remove a woman (Komorny) or when it used its eighth and final challenge to remove another woman (Kraft). ECF No. 18, p. 75-76; ECF No. 20, p. 162. Throughout the first part of her *voir dire*, Komorny expressed discomfort with "being able to deal with the fate of another human being." ECF No. 18, p. 14-23. The prosecutor interrupted her *voir dire* and, in a bench conference, notified the trial court and opposing counsel of the State's intent to challenge her. *Id.*, pp. 23-24. As a result, the defense agreed to cut short its questioning of her. *Id.*

As for Kraft, the record shows she was very nervous throughout her *voir dire*, especially when questioned by the prosecutor, and that she repeatedly equivocated about of her ability to serve on a jury or decide upon a sentence. ECF No. 20, p. 48-61. Her work history included being a teacher's aide in a work program for juvenile offenders and when asked whether she could conceive of a set of facts that would permit her to vote for the death penalty, she responded, "it would have to be pretty bizarre." *Id.* The State's decision to remove Kraft was obvious enough for the trial court to correctly predict it before the prosecutor disclosed it. *Id.*, p. 61-62.

Based on the foregoing, this court concludes that the trial court's failure to find a prima facie showing of discrimination with respect to the prosecution's exclusion of prospective juror Laws is the only occurrence that comes remotely close to constituting *Batson* error. To establish a prima facie case, the defendant must show that "the facts and circumstances of the case 'raise an inference' that the prosecution has excluded venire members from the petit jury on account of their [gender]." *McClain v. Prunty,* 217 F.3d 1209, 1219-20 (9th Cir. 2000) (quoting *Wade v. Terhune,* 202 F.3d 1190, 1195 (9th Cir. 2000) (internal citations omitted)). The burden has been described as "minimal." *Johnson v. Finn,* 665 F.3d 1063, 1071 (9th Cir. 2011). However, this

court must defer to a state court's finding that a *prima facie* showing has or has not been made. *Tolbert v. Page,* 182 F.3d 677, 680, 683-684 (9th Cir.1999) (en banc).

Here, six women, including Laws, were seated in the jury box when the State used its first two peremptory challenges to remove men. ECF No. 15, p. 124-25. The State's prior challenges had been evenly split between men and women when it excused Laws. Two of the other four women sitting in the jury box when Laws was removed had been more complimentary than Laws in responding to questions about Walker's appearance.[10] Walker does not identify, nor can the court discern, any other facts or circumstances that would have raised an inference that the prosecution was excluding venire members based on gender when it removed Laws. *Cf. Cooperwood v. Cambra*, 245 F.3d 1042, 1048 (9th Cir. 2001) (concluding that African-American defendant failed to make out a prima facie *Batson* violation in the prosecutor's peremptory strike of an African-American prospective juror where both jurors excused prior to that juror were white and two African–American women remained seated in the jury box).

Finding no *Batson* error, this court shall deny Ground I.

### Ground K

In Ground K, Walker contends that his conviction and death sentence are in violation of his constitutional rights due to various jury instructions.

In conducting habeas review of the trial court's jury instructions, this court is not permitted to "reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991). In order to successfully challenge a jury instruction on habeas, "it must be established not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment." *Cupp v. Naughten*, 414 U.S. 141, 146 (1973). The petitioner must prove that "'the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" *Estelle v. McGuire*, 502 U.S. at 72 (quoting *Naughten*, 414 U.S. at 147).

---

[10] Juror Ritter stated: "He's got great hair!" ECF No. 17, p. 55. Juror Collins stated: "[H]e didn't look like he had been in jail – looked clean cut." *Id*., p. 166.

The instruction must be viewed in the context of the entire trial and the jury instructions taken as a whole. *See id.* The relevant inquiry is "'whether there is a reasonable likelihood that the jury has applied the challenged instruction'" in an unconstitutional manner. *Id.* (quoting *Boyde v. California*, 494 U.S. 370, 380 (1990)).

1. Mere Presence Instruction

Walker argues that the "mere presence" instruction used at his trial improperly instructed on the elements of aiding and abetting, relieved the State of its burden of proof of the elements, and allowed the jury to convict him without finding all the facts necessary for the charge.

At trial, Walker proposed the following instruction:

> A defendant may be found guilty of robbery and/or murder, even if the defendant personally did not commit the act or acts constituting the crimes but aided and abetted in the commission of the crimes.

> To be guilty of aiding and abetting, it is necessary that the defendant in some sort associate himself with the venture, that he participate in it as in something he wishes to bring about, and that he seek by his action to make it succeed. The jury must unanimously determine that the defendant affirmatively assisted the commission of the crime.

> A defendant's mere presence at the scene of the crime and knowledge that a crime has been or is being committed is not sufficient to establish that an accused aided and abetted the commission of a crime, unless you find beyond a reasonable doubt that he was a participant, and not merely a knowing spectator.

> The evidence must show beyond a reasonable doubt that the defendant acted with the knowledge and intention of helping commit the crimes.

ECF No. 51, p. 64.

Instead, the trial court issued the following instruction:

> Mere presence at the scene of a crime cannot support an inference that one is a party to an offense. However, the defendant's presence, companionship and conduct before, during and after the crime are circumstances from which you may infer his participation in the criminal act.

> The evidence must show beyond a reasonable doubt that the defendant acted with the knowledge and intention of helping commit the crime.

ECF No. 30, p. 14.

On direct appeal, the Supreme Court of Nevada rejected Walker's argument that the trial court's mere presence instruction was inadequate:

> Walker argues that the jury instruction on mere presence failed to instruct the jury that associating a defendant with the crime, rather than with a person who may have committed the crime, was essential. Walker contends that the instruction allowed the State's closing argument to focus on Walker's association with Riker, and allowed the jury to infer guilt based upon this association. Walker had submitted a proposed instruction on mere presence.
>
> It is not error not to give the defendant's proposed instruction on "mere presence" when the actual instruction adequately covers the law. *Doleman v. State*, 107 Nev. 409, 416-17, 812 P.2d 1287, 1292 (1991). We have previously stated, "although mere presence cannot support an inference that one is a party to an offense, presence together with other circumstances may do so." *Palmer v. State*, 112 Nev. 763, 769, 920 P.2d 112, 115 (1996) (quoting *Baker v. State*, 93 Nev. 11, 13, 558 P.2d 629, 629 (1977)).
>
> The instruction at issue here stated that mere presence "cannot support an inference that one is a party to an offense," and that "presence, companionship and conduct before, during and after the crime are circumstances from which you may infer" participation in the offense. Following *Palmer*, we conclude that the instruction was proper.

*Walker*, 944 P.2d at 772-73 (footnote omitted).

Citing *Brooks v. State*, 747 P.2d 893, 894 (Nev. 1987), Walker contends the trial court failed to inform the jury that, to find him guilty under an aiding and abetting theory, it must find that he was a participant in the crime, not merely a knowing spectator. ECF No. 55, p. 133-34. This court does not agree and concludes the trial court's instruction in this case complied with *Brooks*.

In *Brooks*, part of the reason the Supreme Court of Nevada reversed the defendant's conviction is that the trial court determined that the aiding and abetting instruction "sufficiently covered the mere presence theory" and, thus, did not give any mere presence instruction at all. *Brooks*, 747 P.2d at 614. Here, the trial court issued a mere presence instruction. In addition, there is not a significant difference in meaning between that instruction and the mere presence

instruction approved by the court in *Brooks*.[11]  At most, Walker presents a state-law question, the resolution of which is beyond this court's purview.

2.  Unanimity Instruction.

Walker argues that the trial court's instruction on the unanimity requirement relieved the State of its burden of proof of the elements and allowed the jury to convict him without finding all the facts necessary support the charge.  The instruction issued by the trial court stated:

> All verdicts returned in this case must be unanimous.  In considering the offense of Murder of the First Degree, however, you need not be unanimous in finding that the murder was premeditated and deliberate, or that it was perpetrated in the course and furtherance of a robbery or attempted perpetration of a robbery. It is sufficient that each of you finds, beyond a reasonable doubt, that the murder, under either theory, was Murder of the First Degree.

ECF No. 30, p. 21.

On direct appeal, the Supreme Court of Nevada rejected Walker's argument that the instruction violated his constitutional rights:

> Walker contends that this instruction violates his right to due process, because a jury's theory of criminal liability must be unanimous.
>
> In *Schad v. Arizona,* 501 U.S. 624, 640–43, 111 S.Ct. 2491, 2501–03, 115 L.Ed.2d 555 (1991), the United States Supreme Court held that the trial court did not err in failing to require a jury to agree on a single theory of first-degree murder.  At issue was the *mens rea* required for felony murder as compared to the *mens rea* required for premeditated murder. *Id.* The Court noted that both theories carried the same risk of punishment. *Id.* at 644 n. 9, 111 S.Ct. at 2504 n. 9.
>
> In Nevada, aiding and abetting in an act that constitutes an offense carries the same risk of punishment as directly committing the act. *See* NRS 195.020. Also, felony murder and deliberate and premeditated killing are both first-degree murder and are punishable by death. *See* NRS 200.030.  Following *Schad,* we conclude that the trial court did not err in instructing the jury that it did not have to unanimously agree upon a theory of murder.

*Walker*, 944 P.2d at 773.

---

[11]  The *Brooks* instruction reads:
> Mere presence at the scene of the crime and knowledge that a crime is being committed are not sufficient to establish that the defendant aided and abetted the crime, unless you find beyond a reasonable doubt that the defendant is a participant and not merely a knowing spectator.

*Id*. at 613.

Walker argues that *Schad* is not controlling because its "holding was limited to the question of whether felony murder may ever be treated as the equivalent of murder by deliberation." ECF No. 55, p. 144. According to Walker, *Schad*'s analysis "clearly does not apply to the mental state of a person who may be convicted of first degree murder based upon and aider/abettor theory of criminal liability." *Id.*, p. 145. Walker cites to *United States v. Echeverry*, 719 F.2d 974 (9th Cir. 1983), as a case that supports granting him habeas relief. In *Echeverry*, the court held that the trial court must augment the general unanimity instruction "[w]hen it appears . . . that there is a genuine possibility of jury confusion or that a conviction may occur as the result of different jurors concluding that the defendant committed different acts." *Echeverry*, 719 F.2d at 975.

*Echeverry*, however, presented a unique set of circumstances absent here. In a later case, the Ninth Circuit explained the need for the special unanimity instruction in *Echeverry* as follows:

> In *Echeverry,* the defendant was charged with conspiring to distribute cocaine throughout a seven-month period, from December 1980 to June 1981, and actual distribution of cocaine on three separate occasions. *United States v. Echeverry,* 698 F.2d [375, 376 (9th Cir. 1983)]. At trial, proof was offered of cocaine sales in December 1980 and June 1981. *Id.* During jury deliberations, the jury asked, "[m]ay we consider a conspiracy that does not cover that entire time span," and "[m]ay we consider the existence of more than one conspiracy?" *Id.* Under those circumstances, this court had "no means by which [to] be certain that some portion of the jury, in casting a guilty ballot, did not envision a December conspiracy and failed to find enough evidence to believe that there was a June conspiracy, while other jurors envisioned a June conspiracy and not a December conspiracy." *Id.* at 377. Therefore, the jury's note necessitated a special unanimity instruction. *See id.* at 377-78.

*United States v. Kim*, 196 F.3d 1079, 1082 (9th Cir. 1999).

The court in *Kim* rejected petitioner's argument that his conviction for aiding and abetting the possession of stolen goods must be set aside due to the trial court's failure to issue a special unanimity instruction. *Id.* at 1082-83. In so holding, the court noted that, unlike *Echeverry*, Kim was charged with "only a single crime, based upon a single set of facts" and that "[u]nder *Schad*, . . . it was not necessary for the jurors . . . to unanimously agree on a specific

classification of Kim's conduct. Nor was it necessary for them to specify which conduct led them to conclude that Kim was an accessory." *Id*. at 1083. Likewise, the charges in Walker's case arose from a single event or set of facts and *Schad* allowed jurors to arrive at its guilty verdict based on alternative theories of criminal liability.

In summary, Walker does not identify any U.S. Supreme Court precedent contravened by the Supreme Court of Nevada's rejection of Walker's unanimity instruction challenge. Moreover, the state court's decision was based on reasonable interpretation of *Schad*. Thus, the trial court's unanimity instruction does not provide a ground for habeas relief.

3. Flight Instruction.

Walker argues that the trial court's instruction on flight was self-contradictory and created a mandatory presumption that proof of flight equates to guilt. He also argues that the facts of the case did not warrant issuance of the instruction because he was not in control of the vehicle that the State claimed was fleeing and, because he had passed out, he did not have any knowledge of the alleged flight.

This is the instruction at issue:

> The flight of a person after the commission of a crime is not sufficient in itself to establish guilt; however, if flight is proved, it is circumstantial evidence in determining guilt or innocence.
>
> The essence of flight embodies the idea of deliberately going away with consciousness of guilt and for the purpose of avoiding apprehension or prosecution.
>
> The weight to which such circumstance is entitled is a matter for the jury to determine.

ECF No. 30, p. 30.

On direct appeal, the Supreme Court of Nevada rejected Walker's argument that the instruction violated his constitutional rights:

> Walker argues that the jury instruction on flight violated his right to due process because it created a mandatory presumption of guilt, and that the facts of this case did not warrant such an instruction, because he was unconscious in the passenger seat while Riker drove the van.

In *Miles v. State,* 97 Nev. 82, 85, 624 P.2d 494, 496 (1981), this court stated:

> [A] flight instruction may give undue influence to one phase of evidence, therefore we will carefully scrutinize it to be certain that the record supports the conclusion that appellant's going away was not just a mere leaving but was with a consciousness of guilt and for the purpose of avoiding arrest.

> In this case, the instruction stated in part, "The flight of a person after the commission of a crime is not sufficient in itself to establish guilt." This does not create a mandatory presumption. Additionally, evidence supports the conclusion that Walker traveled with a consciousness of guilt and for the purpose of avoiding arrest. We conclude that the flight instruction was proper.

*Walker*, 944 P.2d at 773 (footnote omitted).

The Supreme Court of Nevada's rejection of Walker's flight instruction claim was not contrary to, nor did it involve an unreasonable application of, clearly established Supreme Court precedent. 28 USC § 2254(d). Nor did it involve an unreasonable determination of the facts. *Id.* Evidence presented at Walker's trial warranted giving the flight instruction. *See Hutchins v. State,* 867 P.2d 1136, 1143 (Nev. 1994) (holding that It is proper to instruct on flight where it is reasonable to infer flight from the evidence presented). Within a couple of hours of the murder, Riker and Walker had traveled from Las Vegas to a casino on the Nevada-California border in the TSC van. Based on the testimony of DeFalco (the security officer at the casino), Walker was not passed out or otherwise an unwitting passenger. DeFalco testified that he saw a clean-shaven man with shoulder length blondish-brown hair get into the passenger side the van, then saw the van leave the parking lot at a high rate of speed and head towards California. ECF No. 24, pp. 43-46, 53, 55. DeFalco's description of the passenger fit Riker, not Walker (who had long black hair and a beard at time), which would mean that Walker must have been driving. Riker and Walker then traveled over a hundred miles before crashing the van in Barstow, California while being chased by police. It was reasonable to infer flight from this evidence. *Cf. Hutchins*, 867 P.2d at 1142-43 (describing facts that justified giving the flight instruction).

In addition, the instruction did not give rise to a mandatory presumption. Instead, the instruction plainly informed the jury that flight alone did not equate to guilt, but that the jury

could nonetheless consider it as circumstantial evidence weighing in favor of a finding of guilt.[12] The jury was free to find that there was no flight or, if it found there was flight, accord little or no significance to that fact.

Walker cannot show that the flight instruction by itself "so infected the entire trial that the resulting conviction violates due process.'" *Estelle v. McGuire*, 502 U.S. at 72 (quoting *Naughten*, 414 U.S. at 147); *see also County Court of Ulster County v. Allen,* 442 U.S. 140, 165 (1979) (holding permissive presumption constitutional where there was a "'rational connection' between the basic facts that the prosecution proved and the ultimate fact presumed, and the latter is 'more likely than not to flow from' the former").

Even if the trial court's instruction on flight amounted to constitutional error, it cannot be said that the error had a substantial or injurious effect on the jury's verdict. *See Calderon v. Coleman, 525 U.S. 141, 146–47 (1998).* The instruction specifically cautioned the jury not to infer Walker's guilt from flight alone. The jury necessarily had to rely on other evidence against Walker in order to find him guilty. Indeed, the evidence presented against Walker, as discussed above, was substantial. In light of all of that evidence, it simply cannot be said that he was prejudiced by the flight instruction. *See id*.

Walker is not entitled to federal habeas relief based on the flight instruction.

4. Reasonable Doubt Instruction.

Walker argues that language used in the trial court's reasonable doubt instruction suggested a higher degree of doubt than what is necessary under the reasonable doubt standard established by the U.S. Supreme Court. He also claims that the instruction lowered the State's burden of proof in violation of the Due Process Clause.

The reasonable doubt instruction at Walker's trial read as follows:

> The defendant is presumed innocent until the contrary is proved. This presumption places upon the State the burden of proving beyond a reasonable doubt every material element of the crime charged and that the defendant is the person who committed the offense.

---

[12] Walker's claim that the instruction is self-contradictory defies logic.

A reasonable doubt is one based on reason. It is not mere possible doubt but is such a doubt as would govern or control a person in the more weighty affairs of life. If the minds of the jurors, after the entire comparison and consideration of all the evidence, are in such a condition that they can say they feel an abiding conviction of the truth of the charge, there is not a reasonable doubt. Doubt to be reasonable must be actual, not mere possibility or speculation.

If you have a reasonable doubt as to the guilt of the defendant, he is entitled to a verdict of not guilty.

ECF No. 30, p. 33.

On direct appeal, the Supreme Court of Nevada rejected Walker's argument that the instruction violated his constitutional rights:

Walker argues that the "reasonable doubt" instruction suggested that a higher degree of doubt was required than is required for acquittal under the reasonable doubt standard. *See Cage v. Louisiana,* 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990) (invalidating a jury instruction on reasonable doubt which included the words "substantial" and "grave"). The instruction is a verbatim recital of NRS 175.211(1). We have previously held that the current statutory definition is constitutional. *Milton v. State,* 111 Nev. 1487, 1492, 908 P.2d 684, 687 (1995); *Hutchins,* 110 Nev. at 112, 867 P.2d at 1142. . . .

*Walker*, 944 P.2d at 773-74.

The constitutionality of the reasonable doubt jury instruction depends on "'whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet' the requirements of due process." *Ramirez v. Hatcher*, 136 F.3d 1209, 1211 (9th Cir. 1998) (quoting *Victor v. Nebraska*, 511 U.S. 1, 6 (1994)). The jury instruction on reasonable doubt used at Walker's trial was the same instruction challenged in *Ramirez*, which the court of appeals criticized but nonetheless upheld as constitutional. *Ramirez*, 136 F.3d at 1214-15; *see, also, Nevius v. McDaniel*, 218 F.3d 940, 944-45 (9th Cir. 2000). As such, the law of this circuit forecloses habeas relief based on this jury instruction.

Ground K is denied.

*Ground L*

Walker argues that he was denied his constitutional rights because the State made numerous improper remarks in the presence of the jury that constituted prejudicial prosecutorial

misconduct.  In support of the claim, he cites to comments the prosecutor made during opening argument, throughout the presentation of evidence in the guilt phase of the trial, during the guilt phase closing argument, and during closing argument in the penalty phase.

On direct appeal, the Supreme Court of Nevada rejected Walker's argument that the prosecutorial misconduct violated his constitutional rights:

> "If the issue of guilt or innocence is close, if the state's case is not strong, prosecutor misconduct will probably be considered prejudicial." *Garner v. State*, 78 Nev. 366, 373, 374 P.2d 525, 530 (1962).  Where evidence of guilt is overwhelming, even aggravated prosecutorial misconduct may be harmless error. *Riley v. State*, 107 Nev. 205, 213, 808 P.2d 551, 556 (1991).  After reviewing the record, we conclude that the effect of any prosecutorial misconduct in this case was harmless.

*Walker*, 944 P.2d at 774.

Federal habeas corpus review of prosecutorial misconduct claims is limited to the narrow issue of whether the alleged misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 643 (1974)).  The "standard allows a federal court to grant relief on habeas review when the state court trial was fundamentally unfair but avoids interfering in state-court proceedings when errors fall short of constitutional magnitude." *Drayden v. White*, 232 F.3d 704, 713 (9th Cir. 2000).  "To constitute a due process violation, the prosecutorial misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial." *Greer v. Miller*, 483 U.S. 756, 765 (1987).  "[P]rosecutorial misconduct[ ] warrant[s] relief only if [it] 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Wood v. Ryan*, 693 F.3d 1104, 1113 (9th Cir. 2012) (quoting *Brecht*, 507 U.S. at 637–38).

These are the comments made during opening statements that Walker cites as prosecutorial misconduct:

> State:  We also had to endorse witnesses which I've read to you.  So we have to inform the Defense of all of our witnesses.  We have to informed [sic] them of our theories.  We have to give them our discovery.

Defense:  Objection, your Honor.  This is argument.

The Court:  Sustained.

ECF No. 21, p. 109.

State:  I'm going to tell you what we're going to produce.  Okay. And then Defense counsel's going to tell you what she's going to tell you.  But I want you to keep in mind that she has everything, and I don't.

Defense:  Objection, your Honor.

The Court:  Jurors are admonished to disregard the last remark.

*Id.*, p. 110.

State:  They're kind of like little - the desert-type shrub except they turn into big trees.  They're here.  They're pretty common.  I remember them as a child.

Defense:  Objection as to what [the State] remembers.

The Court:  Sustained.

*Id.*, p. 114.

State:  The radio calls will also indicate that Mr. Walker they say passed out – but he could have been sleeping, but they indicate passed out – as he was going through the Ag Station where somebody was there, or whoever the passenger was.  It may have been Mr. Riker. . . .

Defense:  Objection, speculation.

The Court:  Sustained.

*Id.*, p. 123-24.

Walker cites to the following as examples of improper conduct during the presentation of evidence in the guilt phase:

State:  Your Honor, defense counsel is objecting to NNNNN and QQQQQ, so I'll just put those aside, and you know, cooperate.

The Court:  Okay. Gentlemen, please, if you're going to put them aside, let's put them aside without any comments.

ECF No. 22, p. 32.

The Court:  Mr. [prosecutor], again, keep your remarks to yourself.

State:  Yes, your Honor.  I just want to put my case on.

*Id.*, p. 33-34.

State:  Okay.  Just to remind you or just to let you know, the tennis shoe strings have been cut by someone in the chain of custody in California for the Defense expert.  And . . .

Defense:  Objection to Mr. [prosecutor] testifying.

State:  I'm not testifying.  I just want to let him know that . . .

The Court:  Counsel, you ask him if they're in the same condition, then he'll tell you why.  You may show what happened.  That's the way to do it.

Objection's sustained.

ECF No. 25, p. 54.

The Court:  Mr. [prosecutor] …, I'll remind you folks, one of you is going to have to be last.

State:  Understand.  One moment.  No further questions.  I'll let her have the last word.

The Court:  You may be . . .

Defense:  Objection, your Honor.

The Court:  Sustained. And the jury is admonished to disregard that.  Mr. [prosecutor], I'm becoming quite angry with the continued remarks you're making.

*Id.*, pp. 67-69.

State:  Now, Defense Counsel asked you a leading question about...

Defense:  I'm going to object.

The Court:  Counsel, that question's unnecessary. You've both been leading.

State:  I understand that.

The Court:  So just ask your question and leave personalities alone.  I won't stand for it.

ECF No. 27, p.175-76.

(Bench conference proceedings)

35

The Court: Besides personal education where is this going to?

State: (Indiscernible)

The Court: It's your witness. You put her on there.

State: I know. I'm almost done.

The Court: And no one's concerned what you understand. Let's get rid of it.

(Bench conference proceedings concluded)

State to Witness: Okay. I'm just -- see, I don't understand what you're talking about, about developing these negatives. And if I don't understand, somebody else may not understand. I don't understand why you take Polaroids.

Defense: Objection, your Honor.

The Court: Mr. -- Mr. -- Mr. [prosecutor], no one cares whether you understand or not. It's the jury who has to understand. This is your witness. I would presume that you've talked with her and know what's she's going to testify to.

State: - - I don't understand this . . .

The Court: Can we proceed with something else?

Defense: Objection.

The Court: I'll sustain the objection.

*Id.*, p. 225-26.

Walker cites to the following as examples of improper vouching and/or improper reference to factual matters outside the record during the presentation of evidence in the guilt phase:

State: I would object with regard to using this document in order to -- with regard to the address of Mr. Riker. I have no objection with regard to the back part of it.

The Court: May I see it, please?

State: I just don't want to have anybody draw the inference that this man is lying.

Defense: Your Honor, I object at the time that Mr. . . . .

The Court: Counsel, please, both of you. Both of you are skilled trial lawyers. Let's not do that.

State:  Yes sir.

ECF No. 22, p. 64.

> State:  I'd object, your Honor, to the description of the red material…

> Defense:  I'm sorry.

> State:  ...on the van cover, because that could be paint, and it probably is.

> Defense:  Objection. That's ...

> The Court:  I'll sustain both objections.  Now, if you folks want to be witnesses, please be sworn in.  Both are acting same.

ECF No. 24, p. 18.

> Defense:  Objection, your Honor.  She can't see anything.

> State:  Well, I don't know of too many women that grow beards.

> The Court:  Mr. [prosecutor], please.  I'll sustain the objection.  The jury, I'm sure, can figure out whether or not - - what that might be.

> State:  Okay.

*Id.*, p. 77.

> State:  . . . [This diagram] that Defense counsel showed you, that was prepared because Defense counsel had requested me to obtain this from you as soon as possible.  Isn't that true?

> Defense:  Objection, your Honor.

> The Court:  I'm going to sustain the objection on that, Counsel.

ECF No. 27, p. 220.

> The Court:  Counsel, are you attempting to impeach her, because you [sic] this witness is your own.

> State:  No, I'm not, your Honor.  I'm trying to get her to explain Defense counsel's cross-examination and give her an opportunity to explain that.

> The Court:  Well . . .

> State:  If I may.  She was attacked, and I'm trying to rehabilitate her.

> Defense:  Objection, your Honor.

The Court: I'm going to sustain it.

Mr. [prosecutor], your choice of words is not conducive for lawyers.

State: Yes, sir.

The Court: And you know it.

State: Yes, sir.

*Id.*, p. 226-27.

With regard to closing arguments in the guilt phase, Walker claims the prosecution improperly vouched for a State witness by stating:

Well then you heard [State's witness] Phil Quinn, and it starts filling in the puzzle here, the pieces here, and you see what's going on. . . .

And Mr. Quinn — you know, nice farm boy from Wisconsin gave us a list of clothing, of things in the photographs, that's why we have all these photographs, that he identified.

ECF No. 29, p. 152.

Walker also cites to the prosecutor's interruption of defense counsel's closing argument:

Defense: Officer Lousignont. Where is he? The State didn't call him.

State: I'd object to this line of questioning, your Honor. She knows that he was on vacation and unavailable.

The Court: Counsel, overrule your objection. You're admonished to disregard that last remark. Counsel, things like that if you know about it, please don't do that.

Defense: Your Honor, I didn't know that.

The Court: I did.

Defense: He may have been on vacation. I didn't know that. But the State knows that Officer Lousignont spoke with the owner.

The Court: Excuse me. And Mr. [prosecutor]?

State: Yes, sir.

The Court: If you have an objection, make your objection known. If necessary, take it to the bench, please.

*Id.*, p. 180.

Then, in the State's rebuttal closing argument in the guilt phase, the prosecutor made an objectionable comment:

> State: . . . "Did Walker do this, or did Riker do this?" Well, ladies and gentlemen of the jury, if Kevin Marble [victim] were here I would gladly ask him.
>
> Defense: Objection, your Honor.
>
> The Court: I'll sustain the objection, Counsel.

*Id.*, p. 199.

Turning the penalty phase, Walker claims the following comments improperly denigrated the defense's mitigation case:

> State: Now, who did the legislature have in mind when the mitigating circumstances were decided? The first thing is
>
> "(1) The Defendant has no significant criminal history of prior criminal activity."
>
> Well, "significant history" --sounds good, sounds like fluff.
>
> Defense: Objection, your Honor.
>
> The Court: I'll sustain.
>
> Defense: I'd ask that you ask the jury to disregard that comment.
>
> The Court: So ordered.

ECF No. 32, p. 91-92.

> State: But do you give it the same weight as this lead ball over on the aggravating circumstances? Or do you give it the same weight as a marshmallow of the same size?
>
> Defense: Objection, your Honor.
>
> The Court: Objection's overruled, ma'am. It's argument which he gives to it.

*Id.*, p. 92.

> State: How could anyone under these facts and circumstances determine that this man's involvement was relatively minor? He and Mr. Riker were there from beginning to end, beginning to end. Minor? If anyone could see any

argument that says that this man's conduct was minor, that same argument could be used to say that Mr. Riker's conduct was minor. Those two men committed this murder together. Mr. Riker's 22; he's almost 31.

> Defense: Objection.

> The Court: Objection's overruled, Counsel.

*Id.*, p. 93.

> State: Any other mitigating circumstance. Nice and broad. We don't have that option; Defense does. .... One obvious, even without their witnesses, is the Defendant's an attractive guy. Is that something you're going to take into consideration when you go back to the jury room and discuss? Maybe you should only execute ugly men.

> Defense: Objection, your Honor.

> The Court: Objection's overruled.

*Id.*, p. 94.

> State: So I demonstrated. And you can see the evidence shows and the guilt phase evidence shows that those mitigating circumstances, like marshmallows, do not. . .

> Defense: Objection, your Honor.

> The Court: Counsel, please. I have overruled the last objection on that. I will on this one too.

*Id.*, p. 95-96.

Walker claims the following comments improperly asked the jury to identify with the victim:

> State: . . . Does it matter to Kevin Marble [victim] that this man had no prior significant criminal history?

> Defense: Objection, your Honor.

> The Court: Objection's overruled.

*Id.*, p. 92.

> State: [Marble] carried his photographs quite close to him at the time of his death. He's taking care of business; he's trying to make a life for himself. You don't hear his voice. Do you consider as a mitigating circumstance the voice of the Defendant? No, you should not.

> Defense: I'm going to object again, your Honor.

40

> The Court:  Overruled, Counsel.

*Id.*, p. 95.

Walker claims the prosecutor misstated the law by arguing that "this is a killing of passion" (*id.*, p. 89) and impermissibly commented on Walker's election to exercise his constitutional right to a trial:

> State:  You can make a finding, and if you want to cut the guy a break, fine.  But the facts and circumstances do not justify this man getting a break when he didn't even give any more of a break to Kevin Marble.  He should get exactly what he gave Kevin Marble.  But we can't.  That he got more.  He got due process.
>
> Defense:  Objection, your Honor.
>
> The Court:  Overruled.

*Id.*, pp. 96.

Finally, Walker claims the prosecutor committed misconduct by comparing him to notorious criminals:

> State:  Does the fact that he plays an instrument like everybody seems to want to bring out? So did Nero while Rome was burning.
>
> Defense:  Objection.
>
> State:  What about his poetry and his music?  Is that a mitigating factor?  So was Manson.
>
> Defense:  Objection, your Honor.
>
> The Court:  Objection's overruled, Counsel.  These are matters that were brought out in mitigation.  They're fair comments.

*Id.*, p. 94-95.

Having considered the foregoing statements, individually and cumulatively, this court concludes that, to the extent they may have been improper, any error was harmless.  With respect to the comments in the State's opening statement in the guilt phase, none was particularly egregious.  Moreover, the trial court sustained the defense's objection to each one and instructed the jury that statements, arguments, and opinions of counsel are not evidence. ECF No. 30, p. 36 *see Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987) (whether a curative jury instruction was given

is a factor to be considered in assessing prejudice arising from prosecutorial misconduct); *Richardson v. Marsh*, 481 U.S. 200, 211 (2000) (jurors are presumed to follow the court's instructions).

Likewise, none of the prosecutor's comments during the presentation of guilt phase evidence was unduly prejudicial. While Walker cites to several instances of alleged misconduct, those instances were spread out over eight days of testimony. *See United States v. Young*, 470 U.S. 1, 11 (1985) ("[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial."). In addition, the jury was instructed that it must "not speculate to be true any insinuations suggested by a question asked a witness." ECF No. 30, p. 36. As for the alleged vouching, it was not flagrant enough to cause the jury to convict on the basis of evidence not presented or induce the jury to adopt the government's judgment rather than its own. *See Young,* 470 U.S. at 18.

Finally, this court is also unimpressed with the alleged seriousness of comments made during closing arguments in the guilt phase and the penalty phase. *See Ceja v. Stewart*, 97 F.3d 1246, 1253-54 (9th Cir. 1996) ("Counsel are given latitude in the presentation of their closing arguments, and courts must allow the prosecution to strike hard blows based on the evidence presented and all reasonable inferences therefrom." (citation omitted)); *United States v. Mares*, 940 F.2d 455, 461 (9th Cir. 1991) ("It is a common practice for one side to challenge the other to explain to the jury uncomfortable facts and inferences."). Moreover, the jury was instructed, once again, in the penalty phase that statements, arguments, and opinions of counsel are not evidence. ECF No. 17-24, p. 17.

The Supreme Court of Nevada's ruling on this claim was not contrary to, or an unreasonable application of Supreme Court precedent, and was not based on an unreasonable

determination of the facts in light of the evidence. The court will deny Walker habeas corpus relief with respect to Ground L.

### Ground M

In Ground M, Walker claims that his constitutional rights were violated because the trial court prevented him from presenting mitigating evidence in the penalty phase of his trial. According to Walker, a proposed order authorizing travel and lodging funds for several mitigations witnesses was initially submitted to the trial court on October 4, 1994, six days before the beginning of the penalty phase of his trial. He further alleges that the proposed order was initially rejected and not signed until October 7, 1994, which prevented three of his intended witnesses—Elizabeth Walker (Walker's ex-wife and mother of his two children), Ollie Joshua Walker (Walker's younger brother), and Robbie Wangaline (Walker's close, life-long friend)—from attending the trial. Walker claims that these witnesses would have provided valuable testimony regarding his "good character and good things he has done." ECF No. 109, p. 43.

On direct appeal, the Supreme Court of Nevada rejected Walker's claim that the trial court's delay in approving the funds violated his constitutional rights:

> Walker argues that the district court erred in denying him the opportunity to present mitigating evidence at the penalty hearing. Walker contends that a delay in financing travel and lodging costs prevented three key penalty phase witnesses from testifying.
>
> On June 21, 1994, the trial court scheduled the penalty phase to begin on October 10, 1994. On October 4, 1994, defense counsel submitted an order to the court for the payment of transportation and lodging costs of penalty hearing witnesses. This request was erroneously denied. On October 7, 1994, an order for payment of these fees was filed.
>
> Walker had several months in which to prepare an order for the costs of witness transportation and lodging. He has failed to explain how a three-day delay in the filing of his order prejudiced him. We conclude that this contention lacks merit.

*Walker*, 944 P.2d at 774.

"[I]n capital cases the fundamental respect for humanity underlying the Eighth Amendment . . . requires consideration of the character and record of the individual offender and

43

the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (ellipses in original) (quoting *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976)). Accordingly, the Supreme Court has routinely held that a defendant facing a capital sentence must have the opportunity to present, and have the jury consider, all relevant evidence in mitigation. *See id.* at 604–05*; see, also, Skipper v. South Carolina*, 476 U.S. 1, 8 (1986); *Eddings v. Oklahoma,* 455 U.S. 104, 116 (1982); *Blystone v. Pennsylvania*, 494 U.S. 299, 304 (1990).

Cases of this ilk, however, generally address evidentiary rulings or the application of state law that implicates the presentation or consideration of mitigating factors or evidence. Here, Walker merely claims that the trial court's delay in granting funding approval made it logistically impossible for certain witnesses to appear at his penalty hearing. And, the Supreme Court of Nevada determined that any impediment to Walker's to ability to present the witnesses was due to his own delay in requesting funds. This court is unable to discern, nor does Walker explain, how the Supreme Court of Nevada's holding contravenes U.S. Supreme Court precedent or is based upon an unreasonable determination of the facts. Consequently, this court defers to the Supreme Court of Nevada's rejection of Ground M.

*Ground P*

In Ground P, Walker alleges that his trial counsel committed various errors or omissions that deprived him of effective assistance of counsel, in violation of his constitutional rights. Each of the alleged deficiencies was presented to the Supreme Court of Nevada in Walker's state post-conviction proceeding. ECF No. 80-7, p. 43-73. The Supreme Court of Nevada correctly identified the test announced in *Strickland v. Washington*, 466 U.S. 668 (1984), as the applicable federal law standard, and determined that Walker was not entitled to relief. ECF No. 81-3, p. 2-13. *See Williams v. Taylor,* 529 U.S. at 391 ("It is past question that the rule set forth in *Strickland* qualifies as 'clearly established Federal law, as determined by the Supreme Court of the United States.'").

In *Strickland*, the Supreme Court propounded a two-prong test for analyzing claims of ineffective assistance of counsel (IAC): a petitioner claiming ineffective assistance of counsel must demonstrate (1) that the defense attorney's representation "fell below an objective standard of reasonableness," and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688, 694.

1. Failure to retain effective investigative and expert assistance.

According to Walker, effective counsel would have retained the following experts and/or pursue the following areas of investigation.[13]

(a.) Knife evidence expert

Walker alleges that an expert on knives or knife wounds could have demonstrated that Marble's knife wounds were inflicted by a right-handed person, which would have been exculpatory because Walker is left-handed and Riker is right-handed. The Supreme Court of Nevada addressed this issue as follows:

> [A]ppellant argues that his trial counsel was ineffective for failing to obtain expert testimony regarding the knife evidence or the wounds suffered by the victim. Appellant fails to demonstrate that his counsel's performance was deficient or that he was prejudiced. Appellant fails to demonstrate that any expert would have testified in a different manner from the experts who testified at trial regarding this evidence. Appellant fails to demonstrate a reasonable probability of a different outcome at trial had counsel presented further expert testimony regarding the knife evidence or the victim's wounds. Therefore, the district court did not err in denying this claim.

ECF No. 81-3, p. 4.

Walker has not substantiated his allegation that an expert would have been able to provide exculpatory evidence regarding Marble's knife wounds. He claims that "Dr. Joaquim Almeria" reviewed crime and autopsy photographs and determined that "Marble's stab wounds

---

[13] Walker also makes a vague claim that the investigator appointed to assist counsel lacked the necessary qualifications. It is not clear whether Walker claims this as an independent ground upon which his counsel was ineffective. In any case, the Supreme Court of Nevada determined that Walker had not demonstrated that counsel was ineffective in this regard and that Walker had failed to show prejudice. ECF No. 81-3, p. 3. This court defers to that decision.

45

were inflicted by a right-handed person." ECF No. 55, p. 199-200. Almeria testified at Walker's California trial about the tenets of martial arts. ECF No. 42, p. 85-156. However, the California trial court expressed incredulity regarding Almeria's medical credentials and prohibited him from testifying about stab wounds or making any reference to his claimed medical expertise.[14] ECF No. 41, p. 71-91. Walker has not submitted to this court any verification of Almeria's qualifications or, for that matter, a declaration or report from Almeria supporting his alleged opinion.

In the absence of any credible evidence that an expert on knives or knife wounds would have been helpful to his defense, Walker has not shown the counsel's failure to retain such an expert constituted ineffective assistance of counsel.

(b.) Martial arts expert

Walker alleges that counsel's failure to consult a martial arts expert impacted counsel's advice to Walker that he not testify at trial, which he claims was based on counsel's fear that jurors would not look favorably upon his martial arts background. Walker claims that a martial arts expert's testimony could have been used to overcome jurors' misconceptions. In particular, Walker claims an expert would have been able to testify that Walker's martial arts training was designed to incapacitate aggressors with the least possible injury and that it did not involve the use of knives. The Supreme Court of Nevada addressed this issue as follows:

> [A]ppellant argues that his trial counsel was ineffective for failing to obtain expert testimony regarding appellant's martial arts training. Appellant fails to demonstrate that his counsel's performance was deficient or that he was prejudiced. Appellant fails to demonstrate that it was unreasonable for counsel not to present expert testimony regarding appellant's martial arts training and skills. Given the evidence that shoeprints with characteristics similar to appellant's footwear were found in the victim's blood at the crime scene, that appellant wore a sheath which matched a knife found at the crime scene, and that appellant was discovered in the victim's vehicle shortly after the murder, appellant fails to demonstrate a reasonable probability of a different outcome at trial had an expert on martial arts testified. Therefore, the district court did not err in denying this claim.

---

[14] The court went as far as prohibiting the use of the honorific "doctor" when referring to Almeria. ECF No. 42, p. 87.

ECF No. 81-3, p. 4.

In support of this claim, Walker points to the testimony of Almeria in the California trial, where Walker testified in his own defense and was acquitted on the murder charge. That trial, however, occurred eleven years after Walker's Nevada trial and involved significantly different circumstances. *See Riker v. Benedetti*, 2011 WL 978260, at *7 (C.D. Cal. Feb. 2, 2011). Moreover, there is no evidence in the record, other than Walker's bald allegation, that his martial arts background influenced counsel in advising him not to testify.[15]

The Supreme Court of Nevada's application of the *Strickland* standard to this IAC claim was not objectively unreasonable, nor was its decision based on an unreasonable determination of the facts. Accordingly, this court defers to the state court decision.

(c)  Expert on mental condition

Walker alleges that the head injury he suffered in the car crash prior to his arrest "should have given trial counsel incentive to examine [his] mental health." He claims that inquiry into his mental health would have provided evidence of his substance abuse disorder which would have been exculpatory if presented at trial.

The Supreme Court of Nevada addressed this issue as follows:

> [A]ppellant argues that his trial counsel was ineffective for failing to obtain experts to examine appellant's medical condition following the car crash, as appellant asserts he may have suffered brain damage, may have been rendered incompetent by the injuries he sustained in the crash, or been too intoxicated to have committed the crimes. Appellant fails to demonstrate that his counsel's performance was deficient or that he was prejudiced. Appellant provided no evidence that he was incompetent – that he did not have the ability to consult with his attorney with a reasonable degree of rational understanding and that he did not have a factual understanding of the proceedings against him. See *Melchor-Gloria v. State*, 99 Nev. 174, 179-80, 660 P.2d 109, 113 (1983) (citing *Dusky v. United States*, 362 U.S. 402, 402 (1960)). Given the lack of evidence to support this

---

[15]  In moving for a new trial, counsel indicated that "the single solitary determining factor in the Defense team's decision to present no defense at the close of the State's case" was to preclude the State from presenting a rebuttal witness who had told the prosecution that she saw Walker shortly before the murder and that he appeared completely sober. ECF No. 71-15, p. 5-6. In arguing the motion to the court, counsel stated that, prior to deciding to abort their defense, "we were going to have Richard testify." ECF No. 72-21, p. 6-7. The circumstances surrounding defense counsel's decision to not present any defense witnesses are more fully discussed below.

47

claim, appellant fails to demonstrate a reasonable probability that any challenge to his competency would have been successful.  Further, counsel did have an expert examine appellant's medical records for evidence of intoxication and appellant fails to demonstrate a reasonable probability of a different outcome at trial if there had been further examination of the medical records.  Therefore, the district court did not err in denying this claim.

ECF No. 81-3, p. 4-5.

The Supreme Court of Nevada's decision did not squarely address the main thrust of Walker's claim.  Even so, the claim is wholly without merit.

Here again, Walker points to testimony presented at his California trial – i.e., the testimony of Dr. Mace Beckson, a psychiatrist.  Evidence at the California trial established that Walker, who had been drinking, knocked the victim unconscious when the victim "made a racial slur about Japanese women." *Riker v. Benedetti*, 2011 WL 978260, at *7.  Walker's mother is Japanese. *Id*.  Dr. Beckson "opined that Walker's behavior in knocking [the victim] unconscious was consistent with his being influenced by deep-seated feelings of anger toward his mother and father over their divorce and the disinhibiting effects of intoxication." *Id*.  Dr. Beckson testified to a direct causal link between the victim's racial comment and Walker's conduct. ECF No. 44, p. 161-64.

There is no evidence that similar testimony would have been available or helpful in Walker's Nevada case.  Thus, Walker cannot satisfy either prong of the *Strickland* test with respect to this claim.

(d) Shoeprint expert

Walker alleges that effective counsel would have presented testimony about the prevalence of the type of tennis shoe that could have left the shoeprint impressions left at the murder scene.  He notes that the defense investigator had contacted an expert who would have presented evidence that "at least 500,000 pairs of that particular shoe had been manufactured and distributed throughout the country," but such evidence was not presented to the jury. ECF No. 55, p. 204.  The Supreme Court of Nevada addressed this issue as follows:

[A]ppellant argues that his trial counsel was ineffective for failing to obtain an expert to discuss appellant's shoes and the shoeprints found at the crime

48

scene. Appellant fails to demonstrate his counsel's performance was deficient of that he was prejudiced. The State's expert testified that the shoeprints matched the characteristics of the type of Jordache shoes that belonged to appellant, but acknowledged that the shoeprints could not be conclusively linked to only appellant's shoes as the prints did not contain distinguishing characteristics to eliminate other shoes containing the same sole print. The State's expert testified that he did not know the exact number of shoes with this type of sole print, but acknowledged that many Jordache shoes could have this type of sole and that counterfeit shoes may have the same sole as well. Further, counsel obtained an expert to testify regarding appellant's shoes, but decided not to present that witness' testimony. Such "tactical decisions are virtually unchallengeable absent extraordinary circumstances,["] *Ford v. State*, 105 Nev. 850, 853, 784 P.2d 951, 953 (1989), which appellant did not demonstrate. Given the evidence that appellant wore Jordache shoes and was discovered in the victim's vehicle shortly after the murder, and the testimony of the State's expert, appellant fails to demonstrate a reasonable probability of a different outcome had further testimony been presented on appellant's shoes and the shoeprints. Therefore, the district court did not err in denying this claim.

ECF No. 81-3, p. 5-6.

As noted above in footnote 15, defense counsel decided to not present a defense at the close of the State's case-in-chief in order to prevent the State from calling a potentially harmful witness on rebuttal. The record indicates that, but for that decision, the defense was prepared to present expert shoe testimony. ECF No. 72-21, p. 6-7. Thus, the Supreme Court of Nevada made a reasonable factual determination that defense counsel made a tactical decision to not present a defense, including shoe evidence. *See Wood v. Allen*, 558 U.S. 290, 303 (2010). And Walker has not shown that defense counsel's decision to not present its shoe expert was "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.

(e) Fingerprint expert

Walker claims that effective counsel would have retained a fingerprint expert to scrutinize the fingerprint evidence presented by the State's expert. The Supreme Court of Nevada addressed this issue as follows:

[A]ppellant argues that his trial counsel was ineffective for failing to obtain an expert to examine the State's fingerprint evidence from the vehicle stolen in Blythe, California. Appellant fails to demonstrate counsel's performance was deficient or that he was prejudiced. The State's fingerprint expert testified that appellant's fingerprint was discovered in the Blythe vehicle and appellant fails to demonstrate that any expert would have testified in a different manner. Appellant fails to demonstrate a reasonable probability of a

different outcome at trial had further fingerprint testimony been presented. Therefore, the district court did not err in denying this claim.

ECF No. 81-3, p. 6.

Walker presented no evidence to the state court and has proffered no evidence in this proceeding that undermines the finding or testimony of the State's fingerprint evidence. Thus, he has failed to demonstrate how counsel's alleged omission entitles him to relief under *Strickland. See Wildman v. Johnson*, 261 F.3d 832, 839 (9th Cir. 2001) (noting that speculation that an expert would have testified on the defendant's behalf is not enough to establish prejudice under *Strickland*).

### (f) Dr. Pitterman

Walker claims counsel was ineffective by failing to retain Dr. Pitterman in a timely manner. According to Walker, counsel's late disclosure of the defense's intention to call Dr. Pitterman as a witness resulted in the exclusion of his testimony. The Supreme Court of Nevada addressed this issue as follows:

> [A]ppellant argues that his trial counsel was ineffective for failing to properly present Dr. Pitterman's findings regarding appellant's alcohol and drug use. Appellant asserts that the trial court excluded Dr. Pitterman's testimony because counsel failed to disclose the expert testimony in a timely fashion and that the trial court erred in concluding the testimony amounted to inadmissible hearsay. Appellant fails to demonstrate that his counsel's performance was deficient or that he was prejudiced. While the trial court had a brief discussion with the State and defense counsel regarding the timing of the expert disclosure, the court specifically concluded that Dr. Pitterman's testimony was inadmissible hearsay. The trial court concluded that Dr. Pitterman's testimony was inadmissible hearsay. The trial court concluded that Dr. Pitterman's conclusions regarding appellant's intoxication during the crime rested on out-of-court statements appellant made to Dr. Pitterman shortly before the beginning of trial regarding his drug and alcohol use during the timeframe surrounding the murder. As stated on direct appeal, the trial court properly concluded that appellant's statements were not made for purposes of medical diagnosis, but rather to present appellant's statements regarding his drug and alcohol consumption at trial without appellant having to testify. *Walker v. State*, 113 Nev. 853, 871-72, 994 P.2d 762, 775 (1997); NRS 51.115. As the trial court properly excluded this testimony on hearsay grounds, appellant fails to demonstrate any deficiency or prejudice related to counsel's failure to present Dr. Pitterman's testimony. Therefore, the district court did not err in denying this claim.

ECF No. 81-3, p. 6-7.

In granting the State's motion to exclude Dr. Pitterman's testimony, the trial court stated: "Dr. Pitterman will not be able to testify nor will the State be able to get it in, unless the Defendant testifies." ECF No. 29, p. 24. This undermines Walker's claim that the evidence was excluded due to counsel's delay. It also appears, however, as if the trial court was concerned about unfairness to the State resulting from the late disclosure. *Id.*, p. 26.

In any case, there is little question that the information Walker provided to Dr. Pitterman, for the purposes his report, was excludable hearsay.[16] As discussed above in relation to Ground C, Dr. Pitterman's opinion based on the hospital's test results alone (i.e., without relying on what Walker had told him regarding his ingestion of alcohol and marijuana prior to the murder), would have had very little exculpatory value in the absence of evidence about Walker's alcohol consumption (or lack thereof) after the murder. Accordingly, Walker was not prejudiced by counsel's failure to develop the evidence in a timelier manner. The Supreme Court of Nevada's decision to that effect was reasonable and, therefore, is entitled to deference.

(g) Failure to investigate evidence contamination

Walker alleges that counsel was ineffective for not investigating the possibility that evidence in his case was contaminated. He bases this claim on the fact that the head of the Metro crime lab had been placed on administrative leave in June of 1993 "due to allegations that she knew that a hair sample in the *Cravens* case had been contaminated with the victim's blood prior to sending it to an outside lab for analysis." ECF No. 55, p. 206-07. The Supreme Court of Nevada addressed this issue as follows:

> [A]ppellant argues that his trial counsel was ineffective for failing to investigate possible contamination of the evidence at the crime laboratory. Appellant fails to demonstrate counsel's performance was deficient or that he was prejudiced. Appellant asserts that evidence of contamination in the crime laboratory was presented in a different case, but fails to provide proof that any of the evidence in this case was also contaminated. Accordingly, appellant makes only a bare claim, which is insufficient to demonstrate that he is entitled to relief. See *Hargrove* [v. *State*, 100 Nev. 498, 502, 686 P.2d 222, 225 (1984)]. Appellant

---

[16] As noted above, Walker concedes that his hearsay statements to Dr. Pitterman were not admissible. ECF No. 55, p. 58.

fails to demonstrate a reasonable probability of a different outcome at trial had counsel performed further investigation into possible laboratory contamination. See *Molina v. State*, 120 Nev. 185, 192, 87 P.3d 533, 538 (2004). Therefore, the district court did not err in denying this claim.

ECF No. 81-3, p. 7.

The only nexus Walker attempts to establish between his case and the *Cravens* case is that his defense investigator worked on both cases. In the absence of any significant connection between the two cases, this claim is wholly without merit.

(h) Failure to investigate witness Jody Diaz

Walker alleges that his counsel was ineffective in their handling of Jody Diaz, a witness who, along with Dr. Pitterman, the defense intended to call to establish that Walker was profoundly intoxicated or unconscious at the time of the murder. According to Walker, the circumstances underlying this claim are as follows. Diaz was working as clerk in a liquor store that Walker visited in the afternoon on the day of the murder. According to an affidavit he executed in September 1994, the defense's investigator, Jim Thomas, obtained the following information from Diaz over the course of three separate interviews:

> That sometime in the afternoon Richard Walker purchased a fifth of Everclear. She recalled him because she joked with him regarding the pronunciation of a particular brand of Tequila and believed him to be a Mexican, so asked him how to pronounce that brand name. He asked why she would think he knew how to pronounce that brand name and she told him she thought he was Mexican. He said he was not Mexican and that he was half Japanese. She identified a LVMPD mug photo of Richard Walker and was asked if anyone else was with Walker. She said she did not think so but was not sure. She was shown a LVMPD mug photo of David Riker and she said that she had never seen him before. She said that she never saw him again, that she had only seen him the one time in the liquor store.

ECF No. 30, p. 159-60.

When contacted by Thomas close to the end of the State's presentation of its case, Diaz told Thomas that she had sold Walker a pint of Everclear, not a fifth, and that she had been contacted by the prosecutor a couple days earlier. She further informed Thomas that she had told the prosecutor that after selling Walker the Everclear she saw Walker again at about 10:30 pm

walking along Las Vegas Boulevard (i.e., near the time and location of the murder) with another man and that Walker appeared completely sober.

Walker claims that effective counsel would have tape-recorded the interviews with Diaz and would have been aware of what her testimony would be well in advance of trial. He also claims that effective counsel would have requested a continuance in order to re-interview Diaz, would have called Diaz to testify, and, if necessary, would have impeached any unfavorable testimony with testimony from Thomas.

The Supreme Court of Nevada addressed this issue as follows:

> [A]ppellant argues that his trial counsel was ineffective for failing to adequately investigate the testimony of J. Diaz, as appellant intended to call Diaz as a defense witness until discovering during trial that her testimony was not favorable. Appellant fails to demonstrate that he was prejudiced. As further investigation into Diaz's testimony revealed that she would not provide favorable testimony, appellant fails to demonstrate a reasonable probability of a different outcome had further investigation been undertaken. Therefore, the district court did not err in denying this claim.

ECF No. 81-3, p. 7-8.

Walker's allegations that counsel "panicked" and "did nothing" when they learned of Diaz's interview with the prosecutor are not supported by the record. Instead, it appears from the record that counsel did, in fact, re-interview Diaz after the revelation, "where she again informed us regarding this second sighting." ECF No. 72-21, p. 6. After discussing the matter for "several hours," counsel decided to abandon their defense case rather than risk having Diaz testify on cross-examination or rebuttal "that she saw [Walker] at 10:30 at night on his way to the scene – towards the street where the murder occurred and he was sober, based on her information." *Id.*, p. 6-7. So, after determining that "[they] didn't have anything to impeach Ms. Diaz's second story in any way," defense counsel rested at the conclusion of the State's case-in-chief. *Id.*

This court is unable to conclude that this was anything but a reasonable strategic or tactical decision under the circumstances. It is hard to imagine a scenario in which the jury would have given credence to testimony from Diaz that was favorable to Walker, while

discounting testimony from her that was inculpatory. And, from the defense's perspective, the potential damage her testimony might cause significantly outweighed the potential benefit.

Indeed, it is not clear that Diaz would have been able to provide effective evidence for the defense even if she did not testify about seeing Walker a second time on the night of the murder. According to a July 9, 1992 memorandum Thomas sent to defense counsel, Diaz told Thomas at their first meeting that she did not remember what Walker had purchased. ECF No. 30, p. 70-71. At a hearing on Walker's motion for new trial, Thomas testified that Diaz later remembered it was Everclear, but did not tell him it was a fifth, not a pint, until August 16, 1993, sixteen months after the night in question. ECF No. 73-2, p. 13-16. Moreover, the mere fact that she sold Walker a bottle of Everclear, regardless of size, does not equate to Walker being "profoundly intoxicated" at the time of the murder.

In summary, the Supreme Court of Nevada's conclusion as to a lack of prejudice was a reasonable one. That is, Walker has not demonstrated a reasonable probability that the outcome of his trial would have been different if counsel conducted a more rigorous investigation of Diaz.

(i) Failure to investigate relevant guilt and sentencing issues

Walker faults counsel for not interviewing a single police officer, any of the witnesses who testified against him, the occupants of the apartment complex and surrounding neighborhood where Marble's body was found, staff of the Las Vegas hotel where Walker stayed, or a percipient witness to an incident at the Primadonna Hotel. He also complains that counsel did not obtain copies of the hotel's phone records, perform any public records searches of the witnesses, or examine any of the physical evidence presented at trial.[17]

The Supreme Court of Nevada addressed this issue as follows:

---

[17] Walker also alleges again that counsel was ineffective for not tape recording interviews with Diaz. According to Walker, doing so would have provided the defense with a valuable impeachment tool. As noted above, this court is not convinced that Walker could have presented Diaz as an effective defense witness, while at the same time discrediting testimony that was harmful to the defense.

[A]ppellant argues that his trial counsel was ineffective for failing to interview the State's witnesses, police officers, occupants of the apartment complex where the victim's body was found, the staff of appellant's motel, and a witness from the Primadonna Hotel. Appellant also asserts that counsel should have ensured that the investigator obtained copies of appellant's motel phone records, searched public records for information on the State's witnesses, and examined the physical evidence before trial. Appellant fails to demonstrate that his trial counsel's performance was deficient or that he was prejudiced. As counsel questioned the State's witnesses extensively regarding the pertinent physical evidence and any of the eyewitness' version of events, appellant fails to demonstrate that reasonable counsel would have required further review of the physical evidence or further pretrial interviews with witnesses. Appellant fails to demonstrate that it was unreasonable for trial counsel to fail to direct the investigator to obtain these type of records and appellant fails to demonstrate that any of this type of evidence would have been favorable to the defense. Appellant fails [to] demonstrate a reasonable probability of a different outcome at trial had counsel sought further investigation for any of these records, further examination of the physical evidence, or further interviews with witnesses. *See* [*Molina v. State*, 87 P.3d 533, 538 (Nev. 2004).] Therefore, the district court did not err in denying this claim.

ECF No. 81-3, p. 8.

In the absence of any showing whatsoever that any of these additional steps would have benefitted his defense, Walker is not entitled to relief on this ground.

(j) Biased investigator

Walker alleges that the defense investigator was subject to a conflict of interest because the private investigation firm he worked for also employed the lead detective in the State's case against Walker, who had retired from the police force in July 1992. The Supreme Court of Nevada addressed this issue as follows:

Appellant also asserts that the investigator had a conflict of interest because a prosecution witness in this matter, who was a police officer during the investigation of the murder, was employed by the same private investigation firm as the defense investigator by the time trial had commenced. "'Conflicts of interest and divided loyalty situations can take many forms, and whether an actual conflict exists must be evaluated on the specific facts of each case.'" *Clark v. State*, 108 Nev. 324, 326, 831 P.2d 1374, 1376 (1992) (quoting *Smith v. Lockhart*, 923 F.2d 1314, 1320 (8th Cir. 1991)). Appellant provides no specific facts which would demonstrate that the investigator's employment situation alone caused his defense team to be placed in a situation conducive to divided loyalties. Therefore, appellant fails to demonstrate that his defense team operated under an actual conflict of interest. *Hargrove v. State*, 10 Nev. 498, 502-03, 686 P.2d 222, 225 (1984).

ECF No. 81-3, p. 3 n.1.

Here again, Walker fails to show how the Supreme Court of Nevada's decision constituted an unreasonable application of federal law or was based on an unreasonable determination of the facts.

2. Failure to interview family and friends.

Walker alleges that he was deprived of effective assistance of counsel by virtue of counsel's failure to interview Walker's friends and family members, who would have been able to testify in the guilt phase about his reputation for truthfulness and non-violence. Walker claims that such evidence "would have been important to Mr. Walker's defense at the guilt phase" and would have made counsel recognize that "it was in Mr. Walker's best interests for him to testify." ECF No. 55, p. 210. The Supreme Court of Nevada addressed this issue as follows:

> [A]ppellant argues that his trial counsel was ineffective for failing to interview appellant's friends and family members regarding his reputation for truthfulness and non-violence. Appellant fails to demonstrate that he was prejudiced. Given the evidence that shoeprints with characteristics similar to appellant's footwear were found in the victim's blood at the crime scene, that appellant wore a sheath which matched a knife found at the crime scene, and that appellant was discovered in the victim's vehicle shortly after the murder, appellant fails to demonstrate a reasonable probability of a different outcome at trial had counsel interviewed appellant's friends and family members. Therefore, the district court did not err in denying this claim.

ECF No. 81-3, p. 8-9.

Once again, Walker relies upon evidence presented at his California trial several years later, which included "the testimony of several character witnesses who testified that he was not violent or aggressive and described his background in martial arts." *Riker v. Benedetti*, 2011 WL 978260, at *7. In that case, however, Walker was able to present exculpatory evidence from several other sources and, with his own testimony, provided a plausible account of how the crime occurred. *Id*. Given the different circumstances present in this case, this court is not persuaded that character evidence from friends and family members would have been helpful to Walker's defense. In addition, the record indicates that defense counsel was prepared to present testimony

from friends and family until it learned about the information Jody Diaz had related to the prosecution. ECF No. 72-21, p. 6-7.

Walker has not demonstrated that counsel was ineffective by failing to interview Walker's friends and family in preparation for a guilt phase defense.

3. Failure to object to the aiding and abetting instructions.

Walker claims that counsel was ineffective by not objecting to erroneous and abstract instructions regarding aiding and abetting. According to Walker, the instructions at issue allowed the jury to convict Walker without finding all the requisite elements. In particular, Walker claims that the instructions allowed the jury to rely on an aiding and abetting theory without finding that Walker intended for Riker to kill Marble.

The Supreme Court of Nevada addressed this issue as follows:

> Appellant argues that trial counsel was ineffective for failing to object to the aiding and abetting instruction. Appellant cannot demonstrate deficiency because counsel offered alternative language to the challenged instruction and argued for the court to use that language. Appellant also fails to demonstrate a reasonable probability of a different outcome had counsel argued further regarding the challenged instruction. Therefore, the district court did not err in denying this claim.

ECF No. 81-3, p. 9.

As discussed above in relation to Ground K, Walker proposed a more detailed aiding and abetting instruction that was rejected by the trial court. ECF No. 51, p. 64. In addition, the trial court instructed the jury "the evidence must show beyond a reasonable doubt that the defendant acted with the knowledge and intention of helping commit the crime." ECF No. 30, p. 14. In fact, the State expressed opposition to that language, but defense counsel successfully argued that it should be included in the instruction. ECF No. 29, p. 108-11. And because the jury found Walker guilty of robbery, its first degree murder verdict may have been based on the felony murder rule.

Under these circumstances, this court is unable to conclude the Supreme Court of Nevada's decision was erroneous, much less unreasonable.

57

4. Failure to object to a critical variance between the charging document and the instructions to the jury

Walker claims that effective counsel would have objected because the complaint filed in his case specified that he aided and abetted in Marble's murder by "physically participating in the restraint and/or force employed at the time of the killing," but the jury was never instructed that it had to find that Walker engaged in such conduct in order to find him guilty under an aiding and abetting theory. The Supreme Court of Nevada addressed this issue as follows:

> [A]ppellant argues that his trial counsel was ineffective for failing to argue that the jury instructions did not properly explain that the jury had to find that appellant physically participated in the use of force or restraint, as that is how the State charged the crime in the complaint. Appellant asserts that the unclear instructions allowed the State to improperly change its theory of criminal liability during its closing arguments. Appellant fails to demonstrate that his trial counsel's performance was deficient or that he was prejudiced. The language from the complaint was included verbatim in the jury instructions. In addition, the State did not change its theory of criminal liability, as it maintained throughout the trial that appellant could be liable as the principle actor in the murder, an aider and abettor, or through the felony-murder rule. Appellant fails to demonstrate a reasonable probability of a different outcome at trial had counsel sought further instructions regarding the State's theories of appellant's criminal liability. Therefore, the district court did not err in denying this claim.

ECF No. 81-3, p. 9-10.

In addition to "physically participating in the restraint and/or force employed at the time of the killing," the complaint also listed "counseling, encouraging and planning the offense." ECF No. 9, p. 10. Where the complaint alleges the crime was committed by one or more specified means, an accused must be prepared to defend against all means alleged, regardless of whether they are pleaded in the disjunctive or the conjunctive. *State v. Kirkpatrick,* 584 P.2d 670, 671–72 (Nev. 1978).

Moreover, Nevada law allows the State to amend an indictment or information any time before the verdict "if no additional or different offense is charged and if substantial rights of the defendant are not prejudiced." Nev. Rev. Stat. § 173.095(1). Thus, any objection from defense counsel would have most likely resulted, at most, in an amended charging document and would not have changed the outcome of Walker's trial. This claim is without merit.

5.  Failure to object to the admission of the Blythe evidence

Walker alleges that counsel was ineffective in not taking additional steps to limit the adverse impact of evidence that Walker and Riker had stolen the NOAA van and its contents in Blythe, California.  Over defense counsel's objections, the trial court allowed the State to introduce evidence of the Blythe theft, but prohibited evidence of the related murder. ECF No. 21, p. 96-99.  During the trial, defense counsel moved for mistrial, claiming that, even though the defense had stipulated that the van and its contents had been stolen, the State had presented extensive evidence about the theft, thereby implicating Walker in the Blythe robbery and murder. ECF No. 22, p. 122-24.  The jury was given an instruction at the end of the guilt phase that conformed with Nev. Rev. Stat. § 48.045(2).[18] ECF No. 30, p. 37.

According to Walker, effective counsel would have required the State "to articulate precisely the evidential hypothesis underlying the introduction of the other crime evidence and would have objected to the overly broad jury instruction." ECF No. 55, p. 220.  The Supreme Court of Nevada addressed this issue as follows:

> [A]ppellant argues that his trial counsel failed to require the State to articulate the evidentiary hypothesis underlying the prior bad act evidence and failed to object to the limiting instruction regarding the bad act evidence. Appellant fails to demonstrate that his trial counsel's performance was deficient or that he was prejudiced.  It is clear from the record that the prior bad act evidence regarding a theft of a vehicle from Blythe, California was relevant to the murder in Las Vegas, was proven by clear and convincing evidence, and its probative value was not substantially outweighed by the danger of unfair prejudice. See *Tavares v. State*, 117 Nev. 725, 731, 30 P.3d 1128, 1131 (2001). In addition, the trial court gave a proper limiting instruction regarding the prior bad act evidence. See *id.* at 732-33, 30 P.3d at 1132-33; NRS 48.045(2).  Counsel objected to the introduction of the prior bad act evidence and appellant fails to demonstrate that reasonable counsel would have made further objections regarding admission of that evidence in light of the district court's determination

---

[18]  Nev. Rev. Stat. § 48.045(2) provides:

> Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

that the evidence was admissible. Given the strength of the evidence demonstrating appellant's involvement in the murder, appellant also fails to demonstrate a reasonable probability of a different outcome at trial had counsel sought alternative instructions regarding the prior bad act evidence. Therefore, the district court did not err in denying this claim.

ECF No. 81-3, p. 10.

At Walker's trial, the State made clear that the reason for presenting the Blythe theft evidence was to explain how the stolen property ended up at the murder scene and with the defendants when they were arrested. ECF No. 22, p. 124. As noted by the Supreme Court of Nevada in deciding Walker's direct appeal, Nev. Rev. Stat. § 48.035(3) permits the introduction of evidence of another act or crime that "is so closely related to an act in controversy or crime charged that an ordinary witness cannot describe the act in controversy or crime charged without referring to the other act or crime." *Walker*, 944 P.2d at 772. In addition, the record demonstrates that the trial court properly balanced the prejudicial effect of the Blythe theft with its probative value.

Counsel did not perform below an objective standard of reasonableness with respect to the Blythe theft evidence. In addition, Walker has not demonstrated that additional argument from counsel would have precluded the introduction of the evidence or that counsel erred by not objecting to the court's jury instructions.

6. Failure to object to prosecutorial misconduct

Walker claims that counsel was ineffective for failing to object to or make a record of several instances of the prosecutor making disparaging remarks directed at defense counsel – citing as examples the prosecutor telling defense counsel to "fuck off" and the prosecutor accusing defense counsel of "stealing" from a witness and being "vindictive." The Supreme Court of Nevada addressed this issue as follows:

> [A]ppellant argues that his trial counsel failed to ensure that instances for prosecutorial misconduct were placed on the record and failed to object to other instances of prosecutorial misconduct. Appellant failed to demonstrate that his trial counsel's performance was deficient or that he was prejudiced. Appellant fails to demonstrate that reasonable counsel would have attempted to make a record regarding unrecorded disagreements or arguments with the State. Further,

appellant fails to demonstrate that any unrecorded arguments or disagreements with the State prejudice[d] him. Trial counsel objected to many of the State's statements and appellant fails to demonstrate a reasonable probability of a different outcome at trial had counsel raised further objections. Therefore, the district court did not err in denying this claim.

ECF No. 81-3, p. 10-11.

With respect to the profane remark, there is no convincing evidence the jury heard it, assuming it was made, and no evidence at all that it would have adversely impacted the defense rather than the prosecution. The "stealing" and "vindictive" remarks occurred during a bench conference, presumably out of earshot of the jury. ECF No. 24, p. 130-31. The other alleged instances either do not appear in the record or are so inconsequential as to not be worthy of discussion.

7. Usurpation of Walker's decision whether to testify

Walker alleges that counsel was ineffective by informing him that he was not going to testify without also informing him that he nonetheless had the right to testify if he so desired. The Supreme Court of Nevada addressed this issue as follows:

[A]ppellant argues that his trial counsel improperly usurped his decision-making ability regarding whether he should testify, as appellant asserts counsel told him he would not testify and did not inform appellant he had the right to testify. Appellant fails to demonstrate that counsel's performance was deficient or that he was prejudiced. The trial court informed appellant that he had the right to testify and that he could decide not to testify, thereby notifying appellant that appellant had to make the decision on whether he should testify. Appellant fails to demonstrate a reasonable probability of a different outcome at trial had counsel had further discussions with appellant regarding this issue. Therefore, the district court did not err in denying this claim.

ECF No. 81-3, p. 11.

The record supports the Supreme Court of Nevada's finding that the trial court notified Walker of his right to testify. ECF No. 28, p. 55. There is no evidence in the record that counsel conveyed to Walker that counsel alone controlled the decision as to whether he testified. Walker does not explain how his testimony might have resulted in a more favorable outcome; and, as noted above, defense counsel made a reasonable strategic decision to not put on any defense.

8. Failure to make a record concerning the trial judge

Walker claims that counsel was ineffective in not making a record of the trial judge's "extreme illness." According to Walker, the judge's illness "so impacted his ability to perform his duties" that Walker was deprived of his constitutional right to a fair trial. ECF No. 55, p. 222. The Supreme Court of Nevada addressed this issue as follows:

> [A]ppellant argues that his trial counsel failed to make a record regarding the trial judge's extreme illness, which he alleges caused the trial judge to make inappropriate or inconsistent rulings. Appellant fails to demonstrate that reasonable counsel would have asserted on the record that the trial judge had an illness which caused him to make inappropriate rulings. Appellant fails to identify any rulings that were inappropriately made due to an illness and fails to demonstrate a reasonable probability of a different outcome at trial had counsel sought to make a record for this issue. Therefore, the district court did not err in denying this claim.

ECF No. 81-3, p. 11.

Here again, the record fails to support Walker's allegations. That is, there is no evidence (other than opinions voiced by defense counsel in declarations) the trial judge was suffering from debilitating health problems while presiding over this case. Moreover, the transcripts of the pre-trial, trial, and post-trial proceedings do not show that the trial judge was forgetful, failed to moderate the prosecutor's conduct, or made "unfathomable rulings," as Walker claims.

9. Failure to present a defense

Walker claims his counsel were ineffective for not presenting a defense case after the State presented its case-in-chief. According to Walker, counsel intended, prior to trial, to present a defense that included statements by Riker that he acted alone in killing robbing and killing Marble, expert testimony as to Walker's level of intoxication at the time of the offense, and the testimony of Jody Diaz. During trial, however, counsel learned that they would not be permitted to present Riker's statements or the expert's testimony and that Diaz had changed her story. Walker alleges that, in light of the introduction of evidence the Blythe incident, "the appropriate defense would have been to present through him the totality of the circumstances surrounding his involvement with Mr. Riker." ECF No. 55, p. 222.

The Supreme Court of Nevada addressed this issue as follows:

> [A]ppellant argues that his trial counsel was ineffective by failing to present any defense witnesses and merely arguing that the State failed to prove appellant's guilt beyond a reasonable doubt. Appellant fails to demonstrate that counsel's performance was deficient or that he was prejudiced. Trial counsel stated in the motion for a new trial and at the subsequent hearing that this was a tactical decision. As such, it is "virtually unchallengeable absent extraordinary circumstances," *Ford v. State*, 105 Nev. 850, 853, 784 P.2d 951, 953 (1989), which appellant did not demonstrate. Appellant fails to demonstrate a reasonable probability of a different outcome had counsel used a different defense strategy or presented witnesses. Therefore, the district court did not err in denying this claim.

ECF No. 81-3, p. 12.

As discussed above, counsel had prepared a defense, but made a reasonable strategic or tactical decision to not present it out of concern that doing so would allow the prosecution to present damaging testimony from Jody Diaz on rebuttal. Walker has not established that he had a viable defense that had a reasonable probability of changing the outcome of his trial. And this court is not in a position to question trial counsel's determination, made after re-interviewing Diaz, that it they would not be able effectively impeach her testimony. *See Strickland*, 466 U.S. at 690–91.

The Supreme Court of Nevada's decision to deny this claim was not unreasonable or based on an unreasonable determination of the facts.

10. Trial counsel's erroneous statement

Walker claims counsel was ineffective by informing the trial court that she was not suggesting someone other than Walker committed the crime. Though the comment was made during a bench conference, Walker alleges that he believes jurors heard the remark. The Supreme Court of Nevada addressed this issue as follows:

> [A]ppellant argues that trial counsel was ineffective for stating to the court that the defense was not suggesting that someone other than appellant committed the murder. Appellant fails to demonstrate that his trial counsel's performance was deficient or that he was prejudiced. The challenged statement was made at a bench conference, not to the jury, and was in response to a question from the trial court regarding a line of questioning. Given the context of the statement, appellant fails to demonstrate that counsel acted in an objectively unreasonable manner. As the jury was not privy to this statement, appellant fails to demonstrate

a reasonable probability of a different outcome had counsel not made it.
Therefore, the district court did not err in denying this claim.

ECF No. 81-3, p. 12.

Walker proffers no evidence showing that any juror heard this remark. This claim fails.

11.  Failure to file a motion in limine regarding use of the word "carnie"

Walker alleges counsel was ineffective for not filing a motion in limine to preclude the

prosecution from referring to him as a "carnie."  The Supreme Court of Nevada addressed this

issue as follows:

> [A]ppellant argues that trial counsel was ineffective for failing to move to
> exclude reference to appellant as a "carnie."  Appellant fails to demonstrate that
> his trial counsel's performance was deficient or that he was prejudiced.  The
> carnival manager who employed appellant testified that persons, such as
> appellant, who travel as employees of the carnival are referred to as "carnies."  As
> the basis for the term's use was provided through the manager's testimony,
> appellant fails to demonstrate that reasonable counsel would have objected to use
> of the term "carnie."  Given the few references to the term and the substantial
> evidence of appellant's guilt, appellant fails to demonstrate a reasonable
> probability of a different outcome at trial had counsel objected to use of the term
> "carnie."  Therefore, the district court did not err in denying this claim.

ECF No. 81-3, p. 12-13.

Walker does not refute the Supreme Court of Nevada's conclusion that he fails to

demonstrate *Strickland*-level prejudice with respect to this claim. ECF No. 109, p. 65.  The claim

is denied.

12.  Failure to file a motion in limine regarding Walker's use of a racial slur

Walker claims counsel was ineffective by not filing a motion in limine to prevent the

State from eliciting testimony that Walker told his boss that he was quitting his carnival job

because he was "tired of being treated like a nigger."  Walker alleges that counsel was notified of

the likelihood that the particular witness would provide such testimony prior to trial.  The

Supreme Court of Nevada addressed this issue as follows:

> [A]ppellant argues that his trial counsel was ineffective for failing to file a
> motion in limine to exclude appellant's statement in which he used a racial slur to
> inform his boss that he was quitting his job.  Appellant asserts that the statement
> was too prejudicial to be admissible.  Appellant fails to demonstrate that his trial
> counsel's performance was deficient or that he was prejudiced.  While counsel did
> not file a pretrial motion in limine regarding the challenged statement, counsel

objected to admission of the statement at trial and the objection was overruled by the trial court. Appellant has not demonstrated that counsel's performance was objectively unreasonable. And given the evidence presented of appellant's guilt, appellant fails to demonstrate a reasonable probability of a different outcome at trial had counsel made additional efforts to exclude the challenged statement. Therefore, the district court did not err in denying this claim.

ECF No. 81-3, p. 13.

Walker has not demonstrated a reasonable probability that a motion of limine would have been granted. Thus, this court defers to the Supreme Court of Nevada's decision denying relief.

For the foregoing reasons, each of Walker's IAC claims must be denied because either the Supreme Court of Nevada's decision on the claim is entitled to deference under § 2254(d) or because the claim fails under de novo review.

### Ground Q

In Ground Q, Walker alleges that his appellate counsel committed various errors or omissions that deprived him of effective assistance of counsel, in violation of his constitutional rights. Each of the alleged deficiencies was presented to the Supreme Court of Nevada in Walker's state post-conviction proceeding. ECF No. 80-7, p. 73-77. The Supreme Court of Nevada correctly identified the *Strickland* test as the applicable federal law standard and determined that Walker was not entitled to relief. ECF No. 81-3, p. 13-15. *See Smith v. Murray,* 477 U.S. 527, 535–536 (1986) (applying *Strickland* to claim of attorney error on appeal).

1. Failure to assert, as stand-alone issue, the State's interference with witness Jody Diaz

Walker argues that counsel was ineffective by not arguing on direct appeal that Jody Diaz changed her story about her interactions with Walker on the day of the murder because the State made undisclosed promises to her about sealing her criminal records. Walker's counsel did argue that the trial court erred in not granting her a new trial based, in part, on Diaz's allegedly revised story, but counsel did not raise it as a stand-alone issue. The Supreme Court of Nevada addressed this claim as follows:

[A]ppellant argues that his appellate counsel failed to assert that the State improperly interfered with a defense witness, J. Diaz, causing Diaz to alter her testimony. Appellant fails to demonstrate that his counsel's performance was

65

deficient or that he was prejudiced. Appellate counsel did argue that the State enticed J. Diaz to change her testimony by offering to aid Diaz in the sealing of court records. As this court determined that appellant was not entitled to relief regarding the underlying claim, *Walker v. State,* 113 Nev. 853, 873, 944 P.2d 762, 775 (1997), appellant fails to demonstrate a reasonable probability of a different outcome had counsel raised further arguments regarding Diaz's testimony. Therefore, the district court did not err in denying this claim.

ECF No. 81-3, p. 14-15.

Walker's claim that the State induced Diaz to fabricate testimony is unsubstantiated. The record shows that, while being interviewed by the prosecution, Diaz asked about sealing the records of two misdemeanors, one in 1981 and one in 1987. ECF No. 30, p. 140-41; ECF No. 33, p. 165-70. In ruling upon Walker's motion for new trial, the trial court found that "statements of Jodi Diaz to the prosecution are not the result of any inducement, improper or otherwise, by the prosecution." ECF No. 33, p. 240-41. Walker has not presented evidence that refutes that finding. *See* 28 U.S.C. § 2254(e)(1) (providing that, on habeas review, presumption of correctness accorded state court findings of fact must be rebutted by clear and convincing evidence).

The Supreme Court of Nevada's determination that appellate counsel was not ineffective was not unreasonable.

2. Failure to argue that the State knowingly presented false testimony

Walker alleges that appellate counsel was ineffective for not arguing on direct appeal that the State knowingly presented false testimony from Louis DeFalco, the security officer at the Primadonna Hotel. The Supreme Court of Nevada addressed this claim as follows:

[A]ppellant argues that his appellate counsel was ineffective for failing to argue that the State knowingly presented false testimony from L. DeFalco. Appellant fails to demonstrate that his counsel's performance was deficient or that he was prejudiced. Appellant points to nothing in the trial record showing that DeFalco's testimony was false, and therefore fails to demonstrate that reasonable appellate counsel would have asserted that the State knowingly presented false testimony. Appellant thus also fails to demonstrate that this issue had a reasonable likelihood of success on appeal. Therefore, the district court did not err in denying this claim.

ECF No. 81-3, p. 15.

Walker presents no convincing evidence that the State knowingly presented false testimony. Accordingly, the Supreme Court of Nevada's determination that appellate counsel was not ineffective was not unreasonable.

*Ground R*

In Ground R, Walker alleges that the cumulative effect of errors in his trial and appeal deprived him of his constitutional rights. He has not demonstrated, however, that multiple constitutional errors in concert prejudiced the outcome of his state criminal proceeding. *See Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011) ("Because we conclude that no error of constitutional magnitude occurred, no cumulative prejudice is possible."). Ground R is denied.

## IV. CONCLUSION

For the reasons set forth above, Walker is not entitled to habeas relief.

*Certificate of Appealability*

Because this is a final order adverse to the petitioner, Rule 11 of the Rules Governing Section 2254 Cases requires this court to issue or deny a certificate of appealability (COA). Accordingly, the court has *sua sponte* evaluated the claims within the petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the court's procedural ruling was correct. *Id.*

The COA standard is not high. Walker must only "'sho[w] that reasonable jurists could debate'" the district court's resolution or that the issues are "'adequate to deserve encouragement to proceed further.'" *Hayward v. Marshall*, 603 F.3d 546, 553 (9th Cir. 2010) (en banc) (citations omitted). Having reviewed its determinations and rulings in adjudicating Walker's petition, the court concludes that the *Slack* standard is met with respect to the court's resolution of Ground H—Walker's claim that his constitutional rights were violated because the trial court failed to remove prospective jurors who expressed an inability to impose a sentence with the possibility of parole for first degree murder.

The court therefore grants a COA as to that issue. The court declines to issue a COA for its resolution of any procedural issues or any of Walker's other habeas claims.

IT IS THEREFORE ORDERED that petitioner's first amended petition for writ of habeas corpus **(ECF No. 55) is DENIED**. The Clerk shall enter judgment accordingly.

IT IS FURTHER ORDERED that a Certificate of Appealability is granted as to the following issue:

> Whether this court erred in deciding that Walker is not entitled to habeas relief due to the trial court's alleged failure to remove prospective jurors who expressed an inability to impose a sentence with the possibility of parole for first degree murder.

A COA is otherwise denied.

Dated: June 5, 2018.

ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE